MARYLAND EMPLOYMENT SECURITY ADMINIS-
TRATION *v.* HOLY CROSS HOSPITAL OF
SILVER SPRING, INCORPORATED

[No. 1403, September Term, 1978.]

*Decided September 11, 1979.*

The cause was argued before MORTON and MELVIN, JJ., and
SAMUEL W. BARRICK, Associate Judge of the Sixth Judicial
Circuit, specially assigned.

*Carolyn I. Polowy, Assistant Attorney General,* with whom
were *Stephen H. Sachs, Attorney General, Joel J. Rabin* and
*Lois F. Lapidus, Assistant Attorneys General,* on the brief,
for appellant.

Submitted on brief by *Stanley J. Nadonley* for appellee.

MORTON, J., delivered the opinion of the Court.

This appeal is taken by the Board of Appeals (Board) of the
Maryland Employment Security Administration (ESA) from
an order of the Circuit Court for Montgomery County
(Cahoon, J.), reversing a previous decision of the Board. The

Board had concluded that employers who elect to be "reimbursers" under art. 95A, § 8 (d), Md. Code, are liable for reimbursement to the ESA of all benefits paid, including overpayments made as a result of agency error. The circuit court reversed, holding that a "reimburser" employer is not liable for the repayment of monies erroneously paid out by the ESA.

Holy Cross Hospital of Silver Spring, Inc., the appellee, operates a nonprofit community hospital in Silver Spring, Maryland. It appears that in December, 1974, a former Holy Cross employee, James C. Grissom, applied to the ESA for unemployment benefits. Grissom had been fired for assaulting his supervisor and the hospital disputed his claim on the ground that he had engaged in "gross misconduct." On February 14, 1975, an ESA claims examiner found that Grissom was guilty of "misconduct," as distinguished from "gross misconduct," and under art. 95A, § 6 (c), disqualified Grissom from receiving benefits for a nine week period. The hospital appealed this decision to an appeal referee, who concluded on April 8, 1975, that Grissom had in fact committed "gross misconduct" within the meaning of art. 95A, § 6 (b). The effect of this decision was to increase Grissom's penalty to the extent that he would be disqualified from receiving benefits until he earned ten times his weekly benefit amount.

Prior to the referee's decision, Grissom had been paid benefits totaling $623.00. Holy Cross does not claim that it should receive credit for these payments. Because of "agency error," however, admitted by the ESA, Grissom continued to receive payments after April 8, 1975, when his benefits should have ceased in accordance with the referee's decision. A total of $2,269.50 was erroneously paid by the ESA and it is this sum which is the subject of the instant case.

On May 10, 1976, Holy Cross first requested that it receive credit for the funds erroneously paid to Grissom. The ESA refused to grant such credit and Holy Cross subsequently made at least two other similar requests. By letter dated June 11, 1976, the executive director of the ESA informed Holy

Cross that its request for an adjustment was denied, stating, in pertinent part:

"Under the Unemployment Insurance Law, when a non-profit organization elects, as your client did, to be a reimbursing employer rather than a tax paying one, it becomes a self-insurer, and as such, is not entitled to credits of any kind when overpayments are involved until such time as *full* recovery is effected. In this case there will be no recovery. . .

The provision in the statute relating to crediting the accounts of employers by removing charges when an overpayment occurs, applies only to tax paying and not to self-insurers, since then the latter would not in any way be contributing to the fund which, if a payment is made to reimburse the employer, would bear the cost of the improper payment at no cost to the self-insurer."

Holy Cross appealed the executive director's decision to the Board of Appeals of the ESA. After a hearing, the Board upheld the previous administrative action in which Holy Cross had been "required to reimburse the Unemployment Insurance Trust Fund for benefits paid to former employees due to an error on the part of the agency." Holy Cross appealed the Board's decision to the Circuit Court for Montgomery County. The court reversed the Board, stating, in pertinent part:

"In the critical phrases the statute authorizes the Hospital '. . . to pay to the Executive Director for the Unemployment Insurance Fund an amount equal to the amount of *regular benefits* and one half of the *extended benefits paid,* that is attributable to service in the employ of such non-credit organization, . . .' (emphasis added) Article 95A, Sec. 8 (d) (2), An. Code Md., 1978 Cum. Supp. The legislature in the same statute explicitly defines the word 'Benefits' as '. . . the money payments *payable* to an individual, as provided in this Article, with respect to his

unemployment. (emphasis added) Art. 95A, Sec. 20 (b), An. Code Md., 1969 Rep. Vol.

Courts are to follow legislative definitions and apply the meanings expressed by the legislature's use of the defined words. Here, as expressed, 'benefits paid' are '. . . money payments payable to an individual, as provided in this Article. . .' If what was paid to the claimant was not payable under the act, it was not a benefit paid and is not an amount to be paid by the Hospital."

As a nonprofit organization, Holy Cross was entitled under the provisions of art. 95A, § 8 (d) to elect either to make tax contributions (in the manner of a regular profit-making organization) or to reimburse the Insurance Fund dollar for dollar for benefits paid to its employees. Holy Cross elected the latter procedure, that is, in the words of the statute, to make "payments in lieu of contributions." As Judge Cahoon correctly pointed out in his opinion, the effect of such an election is to make the employer, in essence, a "self-insurer."

The lower court, in reaching its conclusion that a reimburser employer was not liable for benefits erroneously paid, relied heavily on the definition of "benefits" contained in § 20 (b), which is "money payments payable to an individual, as provided in this article . . . ." The court reasoned that "[i]f what was paid to the claimant was not payable under the Act, it was not a benefit paid. . . ." We consider this conclusion a dubious one in light of the language of § 8 (d), which deals specifically with reimburser employers and states, in pertinent part:

"Benefits *paid* to employees of nonprofit organizations shall be financed in accordance with the provisions of this subsection." (Emphasis added.)

It is therefore apparent that under § 8 (d) the critical reference is to benefits "paid" rather than benefits "payable."

It is not contended that there is any express authorization in article 95A for making refunds to reimbursing employers.

It appears from an examination of the refund provisions of § 15 that the section refers only to "contributor" employers. The lower court, although aware of this problem, stated that "[i]f the legislature intended an obscure limit or prohibition, it can more clearly express such a burden to organizations to which it has presented an election to be reimbursers." We believe, however, that the better view is that if the legislature had intended to authorize refunds, or "non-charging," of benefits to reimburser employers, it would have specifically done so, particularly when § 8 (d) is devoid of any language limiting the payments to be made by reimburser employers to those benefits properly paid.

While there is no Maryland authority on this precise point, we note that other jurisdictions are divided on the issue. We find highly persuasive the reasoning of the Court of Appeals of Oregon in *Mann Home v. Morgan,* 19 Or. App. 853, 529 P.2d 964 (1974), wherein the court concluded that "non-charging" of benefits must be limited to "contributing" employers because any other interpretation "... would result in the payment of benefits from the Fund without a corresponding payment of taxes or reimbursement of the Fund by the employer with respect to these former employees. The courts will not give an interpretation to a statute which produces an inconsistent or unreasonable result. We agree with the state that the legislature could not have intended to give reimbursing employers a 'free ride' at the expense of tax-paying employers." (Citations omitted.) *Id.* at 857.

This conclusion also finds support in the legislative history of the provisions permitting nonprofit organizations to elect reimburser status. The states were required by the United States Congress to extend this option to nonprofit employers under the terms of P.L. 91-373 (1970), which amended certain sections of the Internal Revenue Code. The Maryland General Assembly enacted the appropriate legislation in Chapter 790, Laws of Maryland, 1971.

The U. S. Department of Labor prepared draft legislation, which was distributed to the states, demonstrating how the requirements of P.L. 91-373 could be implemented. In the comment following § 8 (f) 4 of the draft legislation, which is

substantially similar to § 8 (d) 4 of the Maryland statute, the Labor Department observed that:

*"Non-charging of benefits to employers reflects concepts that are not reasonably applicable or adaptable to reimbursing employers.* When benefits paid to a former employee of a contributing employer are not charged to the employer's account, he escapes only the consideration of such benefit payments in the computation of his contribution rate. He does not avoid a potential liability to share with all other contributing employers, to the extent that the fund may require, in meeting such benefit costs. Minimum contribution rates, solvency accounts, socialized costs, etc., are devices that recognize this potential liability.

· Reimbursing employers, who are required to pay into the State fund an amount equal to the benefit costs attributable to service in their employment, are in an inherently different position. They are self-insurers, fully liable for such benefit costs of their employees and not liable at all for the cost of any other benefits. If a reimbursing employer, for example, were relieved of the cost of post-disqualification benefits paid to a worker who had quit his employment, no other reimbursing employer could be required to pay into the fund to help meet that cost, as is in effect the case with a contributing employer whose account is non-charged for such a benefit payment. U. S. Dept. of Labor, *Draft Legislation to Implement The Employment Security Amendments of 1970 ... H.R. 14705,* p. 104." (Emphasis added.)

It is apparent that the U. S. Department of Labor did not favor the adoption of non-charging provisions for reimburser employers and we think it is reasonable to assume that the Maryland General Assembly was aware of this policy when it enacted the 1971 legislation. The rationale expressed in the comments to the Labor Department's draft legislation,

quoted *supra,* also demonstrates that there is a rational basis for treating reimburser employers differently from contributor employers with respect to the non-charging of benefits improperly paid. Accordingly, we find no merit in the appellee's equal protection argument, which was only tangentially noted in its brief. Furthermore, it should be remembered that a nonprofit employer can elect to be either a reimburser or a contributor, a fact which further dilutes any claim of improper discrimination.

Finally, we cannot see that holding reimburser employers liable for erroneously paid benefits is in any way inconsistent with the duty of the executive director of the ESA to seek recoupment of overpayments from the claimant. See art. 95A, § 17 (d). Repayment of funds which have been recouped does not appear to be limited to contributor employers. In this case, therefore, Holy Cross could have been repaid if the ESA had been successful in its recoupment efforts. This is precisely the position that the executive director took in the instant case when he informed Holy Cross that a refund could not be made "until such time as full recovery is effected."

In summary, our examination of the language and history of the relevant provisions of article 95A leads us to the conclusion that reimburser employers are liable even for those benefits improperly paid.

*Judgment reversed; costs to be paid by appellee.*