HOLY CROSS HOSPITAL OF SILVER SPRING, INC. *v.*
MARYLAND EMPLOYMENT SECURITY
ADMINISTRATION

[No. 103, September Term, 1979.]

*Decided November 6, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Paul Mannes,* with whom was *Stanley J. Nadonley* on the brief, for appellant.

*Lois F. Lapidus, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Joel J. Rabin, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. DAVIDSON, J., filed a dissenting opinion at page 701 *infra,* in which ELDRIDGE and COLE, JJ, join.

In this case appellee Employment Security

Administration (ESA) erroneously paid out a substantial sum in benefits to a former employee of appellant Holy Cross Hospital of Silver Spring, Inc. (the employer or Holy Cross). We are concerned with the question of whether that sum comes within the purview of Maryland Code (1957, 1979 Repl. Vol.) Art. 95A, § 8 (d) (2) requiring a nonprofit organization electing pursuant to the statute in lieu of paying the regular tax "to pay to the Executive Director for the unemployment insurance fund an amount equal to the amount of regular benefits and one half of the extended benefits paid, that is attributable to service in the employ of such nonprofit organization" and thus whether Holy Cross is obliged to reimburse ESA for the sum erroneously so paid.[1] We conclude that since the sum paid here was attributable solely to error of the agency there is no liability on the part of the employer. Hence, we shall reverse the holding of the Court of Special Appeals in *Maryland Empl. Sec. v. Holy Cross Hosp.,* 43 Md. App. 406, 405 A.2d 766 (1979), and direct that it affirm the judgment of the Circuit Court for Montgomery County.

Prior to the enactment of Chapter 790 of the Acts of 1971 nonprofit employers were not subject to the provisions of the unemployment insurance law. Art. 95A, § 8 (d) (2) as enacted by that chapter specified:

Any nonprofit organization which, pursuant to § 20 (g) (7) of this article is or becomes subject to this article on or after January 1, 1972, shall pay contributions under the provisions of subsections (a), (b) and (c) hereof, unless it elects in accordance with this paragraph, to pay to the Executive Director for the unemployment insurance fund an amount equal to the amount of regular benefits and one half of the extended benefits paid, that is attributable to service in the employ of such nonprofit organization, to individuals for weeks of

---

1. Since the incident here in question took place in December 1974 it would be the statute as it appeared at that time which would be applicable. The critical words in Code (1957, 1979 Repl. Vol.) Art. 95A, § 8 (d) (2) read as they did in 1974.

unemployment which begin during the effective period of that election.

Holy Cross made the election referred to in § 8 (d) (2). The controversy here involves its former employee who filed a claim in December 1974 for unemployment insurance benefits. Holy Cross claimed that the employee here was discharged "for gross misconduct, specifically, taking a heavy object and lunging at his supervisor and chasing him down the hall with the intention, supposedly, of inflicting severe pain." Since Code (1957, 1969 Repl. Vol.) Art. 95A, § 6 (b) specifies that an employee guilty of gross misconduct shall be disqualified from receiving unemployment compensation until he earns ten times his weekly benefit amount, the employer contended that no benefit should be paid. ESA initially found him guilty of misconduct, not *gross* misconduct. This had the effect of disqualifying the employee from benefits for a period of nine weeks. The employer appealed. ESA's referee found what took place to be *gross* misconduct, thus effectively denying benefits to the employee. Nevertheless, ESA continued to make payments to the disqualified employee. The amount paid to him after that decision was $2,269.50. ESA now seeks reimbursement from the employer for the sum erroneously paid.[2]

When the employer was unsuccessful in convincing ESA that it had no liability for reimbursement for benefits paid as a result of agency error, it took the controversy to the Circuit Court for Montgomery County. There Judge Cahoon in a well-reasoned and comprehensive opinion reversed the decision of the Board of Appeals of ESA.

In the circuit court, the Court of Special Appeals and here the employer has pointed to the definition of "benefits" appearing in Art. 95A, § 20 (b) in support of its position that it has no liability for this overpayment. There the term is defined as "money payments *payable* to an individual, *as provided in this article* . . . ." (Emphasis added by the

---

**2.** The employer took no issue with its liability for the sum of $623 paid to the employee *prior* to the final decision of the referee. It is the attempt to charge it for payment of benefits as a result of agency error *after* the finding of the referee with which it takes issue.

employer.) Its argument is that the overpayment simply is not a benefit provided by Art. 95A. The Court of Special Appeals rejected this argument, saying:

> The lower court, in reaching its conclusion that a reimburser employer was not liable for benefits erroneously paid, relied heavily on the definition of "benefits" contained in § 20 (b), which is "money payments payable to an individual, as provided in this article. . . ." The court reasoned that "[i]f what was paid to the claimant was not payable under the Act, it was not a benefit paid. . . ." We consider this conclusion a dubious one in light of the language of § 8 (d), which deals specifically with reimburser employers and states, in pertinent part:
>
>> "Benefits *paid* to employees of nonprofit organizations shall be financed in accordance with the provisions of this subsection." (Emphasis added.)
>
> It is therefore apparent that under § 8 (d) the critical reference is to benefits "paid" rather than benefits "payable." [*Id.* 43 Md. App. at 409.]

This argument of the employer has much to be said for it. However, we need not base our decision upon that specific point.

We have found but five states in which appellate courts have considered an issue analogous to the case at bar, California, Delaware, Florida, Idaho, and Oregon. The relevant cases we have located are *Carleson v. Cal. Unemployment,* 64 Cal. App. 3d 145, 134 Cal. Rptr. 278 (1976); *Unemp. Ins. Appeal Bd. v. Wilm. Medical Center,* 373 A.2d 204 (Del. 1977); *Baptist Hospital, Inc. v. White,* 313 So. 2d 106 (Fla. App. 1975), and the somewhat analogous case of *City of Stuart v. McMullian,* 340 So. 2d 1209 (Fla. App. 1976), relying on *Baptist Hospital; Department of Employment v. St. Alphonsus Hospital,* 98 Idaho 283, 561 P.2d 1316 (1977), and *Mann Home v. Morgan,* 19 Or. App. 853, 529 P.2d 964 (1974). Only *Mann* can be said to give any support to the position espoused by ESA. In that case

benefits had legitimately and legally been paid to certain employees who had left their employment voluntarily and without good cause. For this they were disqualified from receiving benefits for a specified period. The court said it "infer[red] that the three employees in question had served out their respective periods of disqualification as provided in ORS 657.176, and had duly requalified themselves for benefits." *Id.* 19 Or. App. at 855. A statute provided that "[b]enefits paid to an individual for unemployment immediately after the expiration of a period of disqualification for having left work of an employer voluntarily without good cause shall not be charged to that employer." ORS 657.471 (3). At issue was whether this provision was applicable only to the experience rating of taxpaying employers or whether it was also applicable to reimbursing employers. The court pointed to the fact that adopting the construction urged by the employer "would result in the payment of benefits from the Fund without a corresponding payment of taxes or reimbursement of the Fund by the employer with respect to these former employees," and said it "w[ould] not give an interpretation to a statute which produces an inconsistent or unreasonable result." *Id.* 19 Or. App. at 857. Prior to the court's decision in that case a change was made in the statute specifying that the provision was not applicable to reimbursing employers. Thus, the court also said:

> On February 16, 1973, when the above amendment was before the House Committee on Labor and Industrial Relations, the committee minutes show that a spokesman for the Employment Division, which was the proponent of the amendment, appeared before the committee and testified as follows:

> "Federal law requires that reimbursing nonprofit employers reimburse the Fund for all of regular benefits and one-half of extended benefits applicable to wages paid by such nonprofit unit. While this fact is stated in present [ORS] 657.505(7)(a), a new section, Sec-

tion 4 of this 1973 Act, is being added to insure that all are aware that reimbursing employers cannot be relieved of benefit charges regardless of the circumstances involved." Minutes, House Committee on Labor and Industrial Relations, February 16, 1973. [*Id.* at 858.]

\* \* \*

In some situations, as in this case, the amendment may be a declaration of the meaning of the statute. *Layman v. State Unemp. Comp. Com.,* 167 Or. 379, 117 P.2d 974, 136 ALR 1468 (1941); *Kaiser Cement v. Tax Com.,* [250 Or. 374, 443 P.2d 233 (1968)].

From our examination of the legislative history of ORS 657.504, which expressly excludes reimbursing employers from the provisions of ORS 657.471, it is evident that the legislature was merely declaring existing law, and explicitly telling all nonprofit organizations that reimbursing employers are not relieved of benefit charges. [*Id.* at 858-59.]

In *Carleson* the cash amount involved was but $72.00. Obviously, the parties were litigating over principle. The California statute is very similar to ours. The court there pointed out:

In its decision . . . the [State Unemployment Insurance] Board stated as follows: "We adopt the referee's statement of facts and reasons for decision. We agree with his conclusion that amounts *erroneously* paid to the benefit claimant in *excess* of his potential maximum award are not 'benefits . . . paid based on base period wages with respect to employment for the entity.' Such amounts are beyond the statutorily defined limit for which additional cost reimbursement can be charged under the provisions of Unemployment Insurance Code section 803(b) (1). [¶] If the Legislature has left

the Department without a fund against which it can charge these payments, the Department should address its grievance to the Legislature." [3] [*Id.* 64 Cal. App. 3d 148, 134 Cal. Rptr. 280 (Emphasis in court's opinion).]

It also said:

In sustaining the Regents' demurrer to the Department's petition, the trial court stated: "Well, I don't think that a payment that is made by a computer by mistake is a benefit, so I am inclined to sustain the demurrer." [*Id.* 64 Cal. App. 3d 149, 134 Cal. Rptr. 280.]

It further said:

Reimbursement employers are exempt from liability for federal unemployment tax. Accordingly, only tax rate employers fund the administration of the unemployment insurance system. [*Id.* 64 Cal. App. 3d 152, 134 Cal. Rptr. 282.]

The court differentiated between what it called "anticipated overpayments," referring to an overpayment which might take place by virtue of an initial allowance of benefits followed by a denial on appeal, as took place here, and "error overpayments," as also took place here. The court observed, "If the decision allowing benefits is finally overturned on appeal, 'anticipated overpayments' are not charged against the tax rate employer's reserve account. . . ." *Id.* 64 Cal. App. 3d 153, 134 Cal. Rptr. 283. (A similar provision exists in Maryland law. See Code (1957, 1979 Repl. Vol., 1979 Cum.

---

**3.** Apparently the California department concerned with unemployment insurance did "address its grievance to the [California] Legislature" because two years later the California law was amended to include in the sums required to be paid by a nonprofit employer such as Holy Cross those amounts "due to any computational or other error of any type by the Employment Development Department or the Department of Benefit Payments, whether or not such error could be anticipated." Cal.Unempl. Ins.Code § 803 (c) (West Supp. 1980).

Supp.) Art. 95A, § 8 (c) (2) (ii)).[4] It concluded, "Any amount exceeding the maximum amount of allowable benefits does not constitute 'benefits paid based on base period wages;' and a reimbursement employer has no obligation to pay such amounts. . . ." *Id.* 64 Cal. App. 3d 156, 134 Cal. Rptr. 284.

The Delaware case had a slightly different twist. In *Wilmington Medical Center* the issue presented was whether a nonprofit employer which had elected the reimbursement method of assessment was chargeable for unemployment compensation benefits paid to former employees who left such employ without entitlement to compensation but who later became eligible for compensation. The court said it "agree[d] with the Superior Court that such payments are not chargeable, for the reasons stated in that Court's opinion," referring to *Wilmington Med. Ctr. v. Unemployment Ins. App. Bd.,* 346 A.2d 181 (Del. Super. 1975), as well as the reasons stated in its own opinion. The Delaware statute required reimbursements for benefits paid "attributable to service in the employ of such nonprofit organization, to individuals for weeks of unemployment which begin during the effective period of such election." 19 Del. C. § 3345 (c) (3). The lower court stated:

> To interpret the phrase "attributable to service" as meaning any compensation based upon earlier paid wages despite an intervening § 3315 disqualification would violate the apparent intent of the Legislature by imposing costs upon nonprofit organizations for what in the ordinary case of business employers would not be classified as compensated unemployment. [*Id.* 346 A.2d at 183.]

The Supreme Court of Delaware said:

An examination of the Federal Statute mandating

---

4. We emphasize that the employer in this case does not claim that it should not reimburse the State for what the California court called "anticipated overpayments." In this instance the "anticipated overpayment" is the sum of $623 paid to the employee *prior* to the final decision of the referee. The employer has reimbursed ESA for this sum without protest.

unemployment coverage for nonprofit employers, 26 *U.S.C.* § 3309 (1970), and legislative history pertinent thereto, 2 *U.S.C.C.A.N.* pp. 3606-49 (1970), impels the conclusion that such compensation was not intended to be chargeable to a nonprofit employer. As no statutory definition of "attributable to service," nor relevant Delaware legislative history exists we apply the mode presently used for calculating other employer assessments, which excludes payments to employees leaving without entitlement, from calculation of the assessments. [*Id.* 373 A.2d at 205.]

In *Baptist Hospital* an employee left its employment for what he believed would be a better paying job. He was discharged by the subsequent employer prior to earning the minimum amount required in order to make him eligible to draw unemployment compensation from its account. When he applied for unemployment compensation he was paid $405.00 chargeable to that subsequent employer's account before the error was discovered. The Division of Employment Security then demanded that the hospital reimburse it for the sum erroneously paid. The Florida statute was similar to the California, Delaware, and Maryland statutes. The court said in holding the hospital not liable for the erroneous disbursement:

The provisions of the foregoing statute specifically provide that the reimbursement employer pay benefits attributable to service in its employ and only authorizes the Division to bill the reimbursement employer for benefits attributable to service in its employ. The statute does not make any provision for a reimbursement employer paying the Division for payments which the Division erroneously or incorrectly paid. Thus, there is no statutory authority for the Division to charge a reimbursement employer with payments erroneously made. [*Id.* 313 So. 2d 107.]

It has been suggested that the language appearing in Senate Report No. 91-752, 91st Congress Second Session (1970), *reprinted in* [1970] *U. S. Code Cong. & Ad. News* 3606 at 3618 evidences that Congress intended that reimbursers bear the risk and, therefore, the loss occasioned by agency errors which result in erroneous payments to former employees of nonprofit organizations. The committee report was concerned with the amendments to the Federal Unemployment Tax Act which were intended to bring nonprofit organizations such as the employer here within its provisions. It said that "nonprofit organizations would be allowed to adopt a form of self-insurance . . . ." A construction interpreting the statute to make all such employers selfinsurers and thus to make the employer here responsible was rejected by the Secretary of Labor in *Department of Labor v. State of Delaware Department of Labor et al.,* Conformity Proceedings ETA-1 (1979), where he said:

> To understand the Senate Report's language as interpreting section 3309 (a) (2) of FUTA to require "pure self-insurance" (i.e., strict liability) of reimbursing employers is to read too much into the language of the report. [*Id.* at 9.]

In that case the Department of Labor had taken issue with the fact the States of Delaware, New Jersey, and New York, after enacting "legislation permitting non-profit organizations and State and local governmental entities to elect the reimbursement method of financing unemployment compensation costs in lieu of the payroll tax contribution method required to be used by profit-making employers," had "[i]n their interpretation and implementation of their laws ... determined that, under certain circumstances, reimbursing employers need not reimburse the unemployment compensation fund for compensation paid out of that fund." *Id.* at 3. The decision of the Delaware Supreme Court in *Wilmington Medical Center* was one of the interpretations in controversy. Thus, it is perhaps relevant to state that the administrative law judge said in his opinion:

For the reasons below, I find the *rationale* of *Wilmington Medical Center v. Unemployment Insurance Appeal Board,* 346 A.2d 181 (Delaware, [Super.] 1975), affirmed 373 A.2d 205 (1977), dispositive of the issues here presented. Accordingly, I find and conclude that the respective State laws concerning reimbursing employers (including the interpretation and implementation of said laws) are in conformity with FUTA and in substantial compliance with FUTA. [*Id.* at 5 (Emphasis in original).]

He reasoned, "A payment made illegally, improperly, or as the result of mistake or fraud is not a benefit which is 'payable' to a claimant. On the contrary, it was never payable which is the reason it constitutes an overpayment." *Id.* at 6.

The Secretary of Labor said in his opinion:

The States have argued that section 3309 (a) (2) of FUTA requires reimbursement only of compensation attributable under the State law to service with the reimbursing employer. Therefore, since their laws do not attribute to service with the employer certain compensation paid out as an overpayment due to fraud, or due to computer error or other mistakes, or paid out due to service with a subsequent employer, reimbursing employers in their States are not required by section 3309 (a) (2) to reimburse such compensation.

In its Statement of Exceptions and elsewhere in the record the Department of Labor has contended, in essence, that such a procedure constitutes "noncharging" of employers, and that the concept of "noncharging," while relevant to contributing employers, is not relevant to reimbursing employers, which, it has contended, are required by section 3309 (a) (2) to be self-insurers. [*Id.* at 3-4.]

The Secretary further said in his opinion:

> With respect to the statutory language, the recommended decision [of the administrative law judge] stated, in relevant part:
>
>> "Stated simply, the determination of whether compensation benefits paid are 'attributable to service' with a reimbursing employer (and, accordingly, should be charged to the account of said employer for purposes of reimbursement) is committed by the *plain* terms of section 3309 (a) (2) to the States in the administration of their respective statutes. This is dispositive of the instant proceeding.
>>
>> "It is recognized that one State may enact legislation charging reimbursing employers for benefits in a particular situation that would not be chargeable to such employers in another State."
>
> I agree with the above-cited passage of the recommended decision. I therefore find, as a matter of law, that (1) a reimbursing employer must always fully reimburse the State unemployment fund whenever compensation, which is attributable to service with such employer, is paid out of such fund, (2) whether the compensation paid out is attributable to service with such employer is a matter to be determined under the provisions of the unemployment compensation law of the State, which reasonably interpret and implement section 3309 (a) (2) of FUTA, (3) the provisions of State law in issue in this case, whereby compensation is not considered attributable to service with the reimbursing employer when it is paid out due to service with a subsequent employer, or when it is an overpayment due to fraud, or due to computer error or other mistake, are reasonable interpretations and implementations of section 3309 (a) (2) of FUTA, and (4) a reimbursing employer may be

> relieved from reimbursing compensation paid out of .
> the State unemployment fund with respect to its
> former employees whenever it is reasonably
> determined under such provisions of the State
> unemployment compensation law that the
> compensation paid out was not attributable to ser-
> vice with the reimbursing employer. [*Id.* at 6-8
> (Emphasis in original).]

Although we find persuasive the holdings of the California, Delaware, and Florida courts and the decision of the Secretary of Labor, this case must be determined upon the basis of construction of the Maryland statute.

In *Police Comm'r v. Dowling,* 281 Md. 412, 418-19, 379 A.2d 1007 (1977), we set forth a number of the holdings of this Court relative to statutory construction. They include that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent; in determining that intent we consider the language of an enactment in its natural and ordinary signification; a corollary to this rule is that if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly; a court may not insert or omit words to make a statute express an intention not evidenced in its original form; the General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law; and, absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory. See also *Messitte v. Colonial Mortgage Serv.,* 287 Md. 289, 293-94, 411 A.2d 1051 (1980); *In Re James S.,* 286 Md. 702, 705, 410 A.2d 586 (1980); *Board v. Stephans,* 286 Md. 384, 388, 408 A.2d 1017 (1979); *Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 311, 407 A.2d 738 (1979); and *Baltimore Gas & Elec. v. Department,* 284 Md. 216, 219, 395 A.2d 1174 (1979). We have said many times that statutes should be interpreted in a manner which avoids absurd,

illogical, or unreasonable consequences. See, e.g., *Francois v. Alberti Van & Stg. Co.,* 285 Md. 663, 670, 404 A.2d 1058 (1979); *Curtis v. State,* 284 Md. 132, 149, 395 A.2d 464 (1978); *Grosvenor v. Supervisor of Assess.,* 271 Md. 232, 242, 315 A.2d 758 (1974); *Coerper v. Comptroller,* 265 Md. 3, 6, 288 A.2d 187 (1972); *Pan Am. Sulphur Co. v. State Dep't,* 251 Md. 620, 627, 248 A.2d 354 (1968), and cases there cited.

In determining whether Holy Cross has liability we must look at § 8 (d) (2) as a whole. What is required of a nonprofit reimbursing employer is that it pay "an amount equal to the amount of regular benefits and one half of the extended benefits paid, that is *attributable to service in the employ of such nonprofit organization . . . .*" (Emphasis added.)

The Congress and the General Assembly obviously intended to favor nonprofit organizations such as the employer here. Otherwise, there would have been no reason for providing them the option of being responsible for claims of their former employees in lieu of paying the regular tax. To hold as ESA would have us to do would make possible the potentially absurd result of the nonprofit organization's being potentially liable for errors and machinations which could run into many thousands of dollars. Suppose, for instance, that through computer error a number of checks were issued to a claimant which contained three additional zeros to the left of the decimal point. If our statute had words in it similar to that added in California after the *Carleson* decision to the effect that the sum paid by the employer to ESA should include sums paid "due to any computational or other error of any type by [ESA] whether or not such error could be anticipated," [5] then it could be said legitimately that nonprofit employers making the election did so with full knowledge that agency error could cripple them financially. However, no such language appears in the Maryland statute. The payment here was attributable solely to agency error, not to service in the employ of the nonprofit organization. The employee was found ineligible for compensation by reason of gross misconduct relative to his employment by the nonprofit organization. As we see it, the

---

5. Cal.Unempl.Ins.Code § 803 (c) (West Supp. 1980).

plain meaning of the statute is that the employer shall be liable only for those payments made which are attributable to service in its employ. Since the payment made here was as a result of ESA's error and not as a result of service in the employ of Holy Cross, it follows that the Court of Special Appeals erred. We understand the intent of this statute to be that nonprofit employers should be insurers against unemployment, not insurers against governmental error. We realize full well that the result of this decision may be to impose the loss upon the fund to which regular employers contribute. However, when the loss is spread out over all of the contributing employers, it will have but an infinitesimal effect upon any single employer.[6]

> *Judgment reversed and case remanded to the Court of Special Appeals for passage of an order affirming the decision of the Circuit Court for Montgomery County; appellee to pay the costs.*

---

**6.** Cognizance is taken of the dissenting opinion.

The dissent says, "An examination of the phrase 'benefits paid' contained in § 8 (d) (2) in context and in relation to § 20 (b) and § 17 (d) of the statute reveals that the phrase 'benefits paid' may have two different meanings." The term "benefits" is defined in § 20 (b) as meaning "the money payments payable to an individual, as provided in this article, with respect to his unemployment." Because of the provision in § 17 (d) relative to recoupment of benefits "[w]hen any person has received any sum for benefits for which he is found by the Executive Director to have been ineligible," the dissent finds an ambiguity. What the dissent fails to note, however, is that the preamble to the definition embodied in § 20 (b) is "unless the context clearly requires otherwise . . . ." In § 17 (d) the context does clearly require otherwise. Thus, the difference in meaning between "benefits" as used in § 8 (d) (2) and its use in § 17 (d) cannot be the basis for finding an ambiguity.

The fact that a state legislature elsewhere in its wisdom has seen fit to change a statute can hardly be taken as indicating what the statute meant without change nor does it demonstrate the meaning of the words in our particular statute. We have nothing here akin to that which took place relative to the Maryland version of the Uniform Declaratory Judgment Act, originally enacted by Chapter 294 of the Acts of 1939. In a series of decisions, as pointed out by Judge Collins for the Court in Schultz v. Kaplan, 189 Md. 402, 407, 56 A.2d 17 (1947), this Court held "that where there exists an immediate cause of action between the parties for which one of the common remedies of law or equity is adequate and available, a proceeding for a declaratory judgment is not appropriate within the contemplation of that Act." Then, however, the General Assembly passed

*Davidson, J., dissenting:*

The majority here holds that a reimburser is not required to reimburse the Fund for money paid to a former employee as a result of agency error. It bases this holding on an interpretation of the language "attributable to service in the employ of such nonprofit organization" contained in Maryland Code (1957, 1979 Repl. Vol.), Art. 95A, § 8 (d) (2). The majority concludes that the "payment here was attributable solely to agency error and not to service in the employ of the nonprofit organization."

In my view, the language, the legislative history, and the purpose of § 8 (d) (2) indicate that the Legislature intended the phrase "benefits paid" to include money paid to a former employee as a result of agency error and, therefore, intended reimbursers to reimburse the Fund for such payments. The fact that the Legislature intended reimbursers to reimburse the Fund for such payments indicates that it also intended that such payments be considered to be "attributable to service in the employ of such nonprofit organizations." I, therefore, would hold that a reimburser is required to reimburse the Fund for money paid to a former employee as a result of agency error. Accordingly, I respectfully dissent.

Here the reimburser contends that § 8 (d) (2) requires reimbursement for benefits paid but does not require reimbursement for payments that are not benefits. It points out that that section provides, in pertinent part, that any nonprofit employer who elects to reimburse the Fund must reimburse the Fund in:

> "an amount equal to the amount of *regular benefits and one half of the extended benefits paid. . . ."* [1]
> (Emphasis added.)

Chapter 724 of the Acts of 1945 reenacting that Act with a preamble specifying that "[i]t [was] the sense of the General Assembly that the real legislative intent in the passage of the Uniform Declaratory Judgment Act, was that the existence of another adequate remedy at law or in equity should not preclude a judgment for declaratory relief in cases in which it was appropriate," specifying that it was its intent and desire in reenacting that statute "so to change the wording of the Act that it clearly and unmistakably expresses the intention which the General Assembly believe[d] was sought to be expressed in the passage of the Act."

1. Ch. 727, Acts of 1980, effective 1 July 1980, repealed and reenacted Art. 95A, § 8 (d) (2) with changes in language that are not here relevant.

It further points out that § 20 (b) defines "benefits," in pertinent part, as:

> "money payments *payable* to an individual, *as provided in this article. . . .*" (Emphasis added.)

It maintains that because money erroneously paid after a final agency determination of disqualification is not money "payable . . . as provided in this article," such payments are not "benefits" within the meaning of § 20 (b) and § 8 (d) (2). The reimburser concludes, therefore, that it is not required to reimburse the Fund for such payments. I do not agree.

The cardinal rule of statutory construction is to ascertain and effectuate the actual intent of the Legislature. *Department of State Planning v. Mayor of Hagerstown,* 288 Md. 9, 14, 415 A.2d 296, 299 (1980). The primary source from which to determine this intent is the language of the statute itself. In determining whether the meaning of a statutory provision is ambiguous, even when its language appears to be clear, it is necessary to examine that provision in context and in relation to all the other provisions of the statute. *Comptroller of the Treasury v. John C. Louis Co.,* 285 Md. 527, 538, 404 A.2d 1045, 1052-53 (1979). A provision is ambiguous if its meaning is in conflict with other provisions of the same statute. *Celanese Corp. of America v. Davis,* 186 Md. 463, 471, 47 A.2d 379, 383 (1945); *Alexander v. Worthington,* 5 Md. 471, 485 (1854); 2A A. Sutherland, *Statutes and Statutory Construction,* § 46.04 (4th ed. C.D. Sands 1973). When statutory language is ambiguous, a court may consider the statute's legislative history and administrative interpretations and must consider its purpose. *Department of State Planning,* 288 Md. at 15, 415 A.2d at 299.

An examination of the phrase "benefits paid" contained in § 8 (d) (2) in context and in relation to § 20 (b) and § 17 (d) of the statute reveals that the phrase "benefits paid" may have two different meanings. If the word "benefits" were defined in accordance with § 20 (b) as "money payments payable to an individual, as provided in this article," then

the phrase "benefits paid" would refer only to money paid after an agency determination of eligibility. Under such circumstances, a reimburser would not be required to reimburse the Fund for payments made after an agency determination of disqualification or other ineligibility.

The word "benefits" as used in § 17 (d), however, would appear to have a different meaning. That section provides in pertinent part:

> "When any person has received any sum *for benefits for which he is found* by the Executive Director *to have been ineligible,* the amount thereof may be recovered from benefits payable to him or which may be payable to him in the future...." (Emphasis added.)

In view of the parties' concession that under this section, money paid to a claimant after an agency determination of ineligibility may be recovered, there can be no question that the word "benefits" as used in § 17 (d) refers to any money paid to an individual regardless of his eligibility at the time of the payment. If the word "benefits" contained in § 8 (d) (2) were defined in accordance with § 17 (d), then the phrase "benefits paid" contained in § 8 (d) (2) would refer to any money paid, including money paid after an agency determination of disqualification or other ineligibility. Under these circumstances, a reimburser would be required to reimburse the Fund for payments made after an agency determination of disqualification or other ineligibility.

Because the meaning of the word "benefits" in § 20 (b) is in conflict with its meaning in § 17 (d), the meaning of the phrase "benefits paid" contained in § 8 (d) (2) is ambiguous. As a result of this ambiguity, it is unclear whether a reimburser must reimburse the Fund for erroneous payments made after an agency determination that a claimant was disqualified or otherwise ineligible.

A comprehensive review of 26 U.S.C.A. §§ 3301 — 3311 (Employment Security Amendments of 1970) and Md. Code, Art. 95A discloses a statutory scheme that distinguishes between the obligations of employers who pay contributions

to the Fund (contributors) and those of reimbursers. Contributors are required to make payments to the Fund regardless of whether any of their former employees have been paid benefits from the Fund. Contributors must pay the Fund a statutorily determined amount that may be modified by the contributors' experience rating which is essentially based upon the total amount of chargeable benefits paid from the Fund to each contributor's former employee. Art. 95A, § 8 (b); § 8 (c) (2); § 8 (c) (4); § 8 (c) (4) (i).[2] In addition, contributors must pay a surcharge if the fund balance falls below a specified level. § 8 (c) (4) (ii).[3] Moreover, FUTA requires contributors to pay a Federal unemployment tax, 26 U.S.C.A. § 3301,[4] that provides the funds for the

---

**2.** Art. 95A, § 8 (b) provides:

"Each employer shall pay contributions equal to two and seven-tenths per centum of wages paid with respect to employment except as hereinafter provided."

§ 8 (c) (2) provides in pertinent part:

"The Executive Director shall maintain an experience-rating record for each employer.

. . .

[A]ll regular benefits and ... any extended benefits paid to [a claimant] shall be charged against the experience-rating record of his principal base period employer...."

§ 8 (c) (4) provides in pertinent part:

"The Executive Director shall determine for each fiscal year the contribution rate of each employer ... on the basis of his experience-rating record...."

§ 8 (c) (4) (i) provides in pertinent part:

"The Executive Director shall compute for each employer a benefit ratio that is the quotient obtained by dividing the total regular and extended benefits chargeable to his experience-rating record ... by the total of his annual payrolls...."

**3.** § 8 (c) (4) (ii) provides in pertinent part:

"[W]hen the fund balance on the computation date is less than 4.5 percent ... the rates at which employers shall be required to pay contributions shall be in accordance with the table of basic rates, adjusted as shown in the table of basic rate adjustments...."

**4.** 26 U.S.C.A. § 3301 provides in pertinent part:

"There is hereby imposed on every employer ... an excise tax, with respect to having individuals in his employ, equal to ... 3.4 percent ... of the total wages ... paid by him during the calendar year with respect to employment (as defined in section 3306(c))."

Maryland Unemployment Insurance Administration Fund, from which, in turn, the administrative expenses of ESA are paid. Art. 95A, § 14.[5]

The Legislature, recognizing that administrative errors occur, provided that under specified circumstances, payments from the Fund made to former employees are not to be charged against a contributor's experience rating. § 8 (c) (10) (A); § 8 (c) (10) (B); § 8 (c) (2) (ii); § 8 (c) (8) and § 17 (e); § 8 (c) (8) and § 17 (d).[6] In addition, if the Executive Director determines that a contribution was erroneously collected, a contributor is entitled to an adjustment in the form of a credit or a refund. § 15 (b).[7] Although the individual contributor is thus afforded some degree of relief, he, like all other contributors, must ultimately share in and pay for

---

§ 3306 (c) provides in pertinent part:

"[T]he term 'employment' means any service performed . . . except . . . (8) service performed in the employ of a religious, charitable, educational, or other organization described in section 501 (c) (3) which is exempt from income tax under section 501(a)."

Thus, nonprofit employers, whether they elect to contribute to or reimburse the Fund, are not required to pay the FUTA tax.

**5.** Art. 95A, § 14 (a) provides in pertinent part:

"There is hereby created in the State treasury a special fund to be known as the Unemployment Insurance Administration Fund. . . . All moneys in this fund which are received from the federal government . . . shall be expended solely for . . . the proper and efficient administration of this article."

**6.** A contributor's experience rating is not charged if a former employee was not entitled to the money paid him because he left his employment voluntarily (§ 8 (c) (10) (A)), was found guilty of committing a crime against the employer (§ 8 (c) (10) (B)), was found to be disqualified as a result of reversal of a previous agency determination (§ 8 (c) (2) (ii)), was found by the Executive Director to have made false statements knowingly in order to obtain benefits (§ 8 (c) (8) and § 17 (e)), or was found by the Executive Director not to have been entitled to receive the money because he had received retroactive wages, had been employed at the time, or had been disqualified or otherwise ineligible for such benefits (§ 8 (c) (8) and § 17 (d)).

**7.** § 15 (b) provides in pertinent part:

"Where any employing unit has made a payment to the Executive Director of contributions . . . the employing unit . . . may make application to the Executive Director for an adjustment thereof . . . or for a refund. . . . If the Executive Director shall determine that such amount . . . was erroneously collected, the Executive Director shall allow . . . an adjustment. . . ."

the cost of these agency errors, all of which result in payments from the Fund. § 20 (i).[8]

Reimbursers are not required to make any payment to the Fund unless a former employee has been paid money from the Fund. The reimburser must pay the Fund only the amount that was paid from the Fund to a former employee. § 8 (d) (2). Reimbursers are not required to pay a surcharge if the Fund balance falls below a specified level. Moreover, they are not required to pay the FUTA tax and, therefore, do not share in the costs of the Fund's administration. 26 U.S.C.A. § 3301 and § 3306 (c) (8). Finally, Art. 95A does not provide for any kind of relief for reimbursers when agency error results in payments from the Fund to the reimbursers' former employees.

At the time § 8 (d) (2) was enacted, the Legislature was cognizant of the differences between the obligations of contributors and reimbursers. It also recognized that agency errors occur. It was fully aware that although it had afforded some degree of relief to contributors by providing that their individual experience ratings not be charged for agency errors which resulted in payments of money from the Fund to their individual employees, it nonetheless had required that employers must ultimately share in and pay the cost of agency errors which resulted in payments of money from the Fund. In the absence of an express provision affording reimbursers any form of relief, there is nothing to indicate that when an agency error results in the payment of money from the Fund to reimbursers' former employees, the reimbursers should be excused from the employers' ultimate obligation to pay the cost of such errors.

In my view, the entire statutory scheme embodied in the Employment Security Amendments of 1970 and Md. Code, Art. 95A evidences a legislative intent that reimbursers who

---

**8.** § 20 (i) provides:

" 'Fund' means the Unemployment Insurance Fund established by this article, into which all contributions and payments in lieu of contributions required and *from which all benefits provided under this article are paid.*" (Emphasis added.)

do not contribute to the Fund, and who do not share in the expenses of maintaining or administering it, should not be afforded relief from the cost of agency errors made with respect to the reimbursers' former employees at the expense of the contributors who ultimately pay those costs. While it may appear somewhat inequitable to require reimbursers to pay for agency errors for which they are not responsible, it must be remembered that they elect to become reimbursers and may at their option terminate that election to become contributors to the Fund. In my view, it is even more inequitable to require contributors to pay for agency errors for which they are no more responsible than are reimbursers when it is remembered that contributors alone bear the total administrative costs of the Fund.

The legislative history of the Employment Security Amendments of 1970 evidences the same legislative intent. Senate Report No. 91-752, 91st Congress, 2d Session, *reprinted in* [1970] *United States Code Congressional and Administrative News,* 3606, 3618, was issued before Congress enacted the Employment Security Amendments of 1970 to the Federal Unemployment Tax Act which subjected nonprofit employers to its provisions. That report stated, in pertinent part, that by permitting nonprofit employers to elect the status of reimbursers rather than contributors, "the nonprofit organizations would be allowed to adopt a form of self-insurance."

In my view, Senate Report No. 91-752 evidences that Congress intended reimbursers to bear the risk and, therefore, the loss occasioned by agency errors that result in erroneous payments to their former employees. I recognize that certain elements of self-insurance may not be applicable to a reimburser. However, the essence of self-insurance is the assumption by the self-insurer of the otherwise insurable risks associated with the activity in question. The risk of loss resulting from agency error is such a risk. The Fund insures a contributor against the risk of loss resulting from agency error with respect to its former employees. If a reimburser is intended to be a self-insurer, it must be regarded as assuming the risk of loss resulting from

agency error with respect to its former employees. Any reimburser unwilling to assume this risk may elect to become a contributor.

In order to assist the States in implementing the Employment Security Amendments of 1970, the Manpower Administration of the Department of Labor issued a document entitled "Draft Legislation to Implement the Employment Security Amendments of 1970 . . . H.R. 14705, Together with Explanatory Commentary." The commentary following § 8 (f) (5), which is substantially similar to Art. 95A, § 8 (d) (2), provided in pertinent part:

> "Non-charging of benefits to employers reflects concepts that are not reasonably applicable or adaptable to reimbursing employers. When benefits paid to a former employee of a contributing employer are not charged to the employer's account, he escapes only the consideration of such benefit payments in the computation of his contribution rate. He does not avoid a potential liability to share with all other contributing employers, to the extent that the fund may require, in meeting such benefit costs. Minimum contribution rates, solvency accounts, socialized costs, etc., are devices that recognize this potential liability.

> "Reimbursing employers, who are required to pay into the State fund an amount equal to the benefit costs attributable to service in their employment, are in an inherently different position. *They are self-insurers, fully liable for such benefit costs of their employees* and not liable at all for the cost of any other benefits. If a reimbursing employer, for example, were relieved of the cost of post-disqualification benefits paid to a worker who had quit his employment, no other reimbursing employer could be required to pay into the fund to help meet that cost, as is in effect the case with a contributing employer whose account is non-charged for such a benefit payment." [United

States Dept. of Labor, Draft Legislation to Implement the Employment Security Amendments of 1970 . . . H.R. 14705 at p. 104.] (Emphasis added.)

This language shows that at the time the States were preparing to implement the Employment Security Amendments of 1970, the Department of Labor's administrative interpretation of those amendments was that reimbursers were self-insurers required to bear the loss occasioned by agency errors.

I assume that in 1971 when the Maryland Legislature enacted § 8 (d) (2), it was aware of the legislative history of the Employment Security Amendments of 1970 and the Department of Labor's administrative interpretation.[9] *Messitte v. Colonial Mortgage Serv. Co.,* 287 Md. 289, 294, 411 A.2d 1051, 1053 (1980); *Police Comm'r of Baltimore City v. Dowling,* 281 Md. 412, 419, 379 A.2d 1007, 1011 (1977); *Allers v. Tittsworth,* 269 Md. 677, 684, 309 A.2d 476, 480 (1973). Both support the view that the Legislature intended reimbursers to reimburse the Fund for payments made as a result of agency error.

This conclusion is consistent with the purpose of § 8 (d) (2). In *North Charles General Hospital, Inc. v. Employment Security Administration,* 286 Md. 115, 121, 405 A.2d 751, 755 (1979), this Court recognized that the Legislature's general purpose in enacting § 8 (d) (2) was to minimize the economic burden of reimbursers' participation in the Fund. At the same time, the Court determined that the Legislature intended reimbursers to be entitled to minimize their

---

**9.** The majority relies on a 1979 decision of the Secretary of Labor in a conformity proceeding involving the States of Delaware, New Jersey and New York that I find to be unpersuasive. *United States Dept. of Labor v. Delaware et al.,* Conformity Proceedings-ETA-1 (31 Oct. 1979). The Secretary's statement there that the term "self-insurer," appearing in Senate Report No. 91-752, did not evidence a congressional intent "to require 'pure self-insurance' (i.e., strict liability) of reimbursing employers . . ." was dicta. The Secretary's holding was that the question whether a reimburser may be relieved of the obligation of reimbursing for payments made as a result of agency error was a matter of state law. Moreover, the Secretary's decision is irrelevant to the interpretation of § 8 (d) (2) because that section was enacted by the Maryland Legislature in 1971.

economic burden only under the very limited circumstances expressly provided by statute.

The majority recognizes that "this case must be determined upon the basis of construction of the Maryland statute." Yet the only rationale it offers for its interpretation of § 8 (d) (2) is that "the Congress and the General Assembly obviously intended to favor nonprofit organizations such as the employer here." Thus, in reaching its result the majority totally ignores the statutory scheme embodied in the language of the Act, the legislative history of the Employment Security Amendments of 1970, the Department of Labor's administrative interpretation, and the purpose of § 8 (d) (2) as articulated by this Court in *North Charles.*

In my view, the language, the legislative history, and the purpose of § 8 (d) (2) indicate that the Legislature intended reimbursers to reimburse the Fund for payments made as a result of agency error. I am persuaded that the Legislature intended the phrase "benefits paid" contained in § 8 (d) (2) to refer to any money paid, including money paid to a former employee after an agency determination of disqualification or other ineligibility. Moreover, because the language, the legislative history, and the purpose of § 8 (d) (2) indicate that the Legislature intended reimbursers to reimburse the Fund for payments made as a result of agency error, I can only conclude that the Legislature further intended that such payments must be considered to be "attributable to service in the employ of such nonprofit organization[s]." I, therefore, would hold that a reimburser is required to reimburse the Fund for payments erroneously made after a final agency determination that a claimant was disqualified or otherwise ineligible to receive payments.[10]

---

10. A similar result has been reached under analogous circumstances by the Court of Appeals of Oregon and the Oregon State Legislature. In 1974, the Court of Appeals of Oregon, in deciding Mann Home v. Morgan, 19 Or. App. 853, 529 P.2d 964 (1974), applied the *Oregon Employment Security Act* as it existed prior to 1973 Amendments and held that reimbursers are required to reimburse the Fund for payments properly made as a result of an agency determination of eligibility after the expiration of a period of disqualification although contributors would not be charged for the payment of such benefits. Or.Rev.Stat. § 657.471(3) (1979). In 1973, the Oregon State Legislature amended the statute to require reimbursers to reimburse the Fund for such payments. Or.Rev.Stat. § 657.504 (1979).

Accordingly, I would affirm the judgment of the Court of Special Appeals.

Judges Eldridge and Cole authorize me to state that they join me in the views expressed herein.

---

I am not persuaded by the opinions of the courts in California, Florida, and Idaho, cited by the majority, that have reached opposite results under the same or analogous circumstances. Neither were the legislatures of those states. Indeed, the holdings in each of these cases was undone by enactments of the appropriate state legislatures.

In 1976, the California Court of Appeals, in deciding Carleson v. California Unemployment Ins. Appeals Bd., 64 Cal. App. 3d 145, 134 Cal. Rptr. 278 (1976), held that reimbursers are not required to reimburse the Fund for payments erroneously made to ineligible claimants. Cal.Unempl.Ins.Code § 803 (c) (West 1972). In 1978, the California State Legislature amended the California Unemployment Insurance Code to require reimbursers to reimburse the Fund for payments made as a result of such agency error. Cal.Unempl.Ins.Code § 803 (c) (West Supp. 1980).

In 1975, the District Court of Appeal of Florida, in deciding Baptist Hospital, Inc. v. White, 313 So. 2d 106 (Dist. Ct. App. Fla. 1975), held that reimbursers are not required to reimburse the Fund for payments made as a result of an erroneous determination of eligibility that is subsequently reversed. Fla.Stat.Ann. § 443.08 (3) (e) 1c (West 1966). In 1977, that Court, in deciding City of Stuart v. McMullian, 340 So. 2d 1209 (Dist. Ct. App. Fla. 1977), held that a political subdivision that is a reimburser is not required to reimburse the Fund for payments made as a result of an erroneous determination of eligibility that is subsequently reversed. Fla.Stat.Ann. § 443.07 (5) (b) (West 1966). In 1978, the Florida State Legislature amended the Florida Unemployment Compensation Act to require reimbursers to reimburse the Fund for payments made as a result of an erroneous determination of eligibility that is subsequently reversed. Fla.Stat.Ann. § 443.07 (5) (b) & (c) & § 443.08 (3) (i), (k) & (l) (West Supp. 1980).

In 1977, the Supreme Court of Idaho, in deciding Department of Employment v. St. Alphonsus Hosp., 98 Idaho 283, 561 P.2d 1316 (1977), applied the Idaho Employment Security Law as it existed prior to 1976 Amendments and held that reimbursers are not required to reimburse the Fund for payments made as a result of an agency determination of eligibility that is subsequently reversed. Idaho Code § 72-1349 (f) (1973). In 1976, the Idaho State Legislature amended the statute to require reimbursers to reimburse the Fund for payments erroneously made not only as a result of an agency determination of eligibility that is subsequently reversed, but also after a final agency determination that a claimant was disqualified or otherwise ineligible. Idaho Code § 72-1349A (a) (1) (Supp. 1980).