## STATE OF MARYLAND *v.* CRAIG WESLEY MOON

[No. 141, September Term, 1980.]

*Decided October 14, 1981.*

*Motion for reconsideration filed October 20, 1981; opinion modified and as modified, motion denied. Supplementary motion for reconsideration filed November 10, 1981; denied November 20, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Maureen O'Ferrall, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*John L. Kopolow, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. ELDRIDGE and DAVIDSON, JJ., dissent. DAVIDSON, J., filed a dissenting opinion at page 479 *infra,* in which ELDRIDGE, J., concurs.

We shall here hold that the exclusionary provisions of Maryland Code (1974, 1979 Cum. Supp.) § 10-309, Courts and Judicial Proceedings Article, are not applicable to evidence of the blood alcohol content of an accused where the blood was extracted for the purpose of treatment. Hence, we shall reverse the determination to the contrary by the Court of Special Appeals in its unreported opinion in this case.

Craig Wesley Moon was convicted in a nonjury trial in the Circuit Court for Carroll County on two counts of manslaughter by automobile (Code (1957, 1976 Repl. Vol.)

Art. 27, § 388) and one count of driving while intoxicated (Code (1977) § 21-902 (a), Transportation Article). On appeal the Court of Special Appeals relied on *Loscomb v. State,* 45 Md. App. 598, 612-13, 416 A.2d 1276 (1980), aff'd, 291 Md. 424, 435 A.2d 764 (1981), a case involving analysis of blood extracted at a hospital by express direction of a police officer without the consent of the accused but while he was conscious. A citation had already been issued to him at that time charging him with operating a vehicle in violation of § 21-902, Transportation Article. The Court of Special Appeals reversed, holding that the evidence must be excluded because there had not been compliance with the statute in question. In the process of its opinion reference was made to *Major v. State,* 31 Md. App. 590, 358 A.2d 609, *cert. denied sub nom. Flanagan v. State,* 278 Md. 722 (1976), and the fact that the blood sample here was not obtained within the two hour limitation imposed by §  10-303. We granted the State's petition for the writ of certiorari.

The facts relevant to the contentions before us may be briefly stated. They are gleaned from the agreed statement of facts presented by the parties pursuant to Maryland Rule 828 g.

Moon was involved in an automobile accident in Carroll County, north of Westminster, at approximately 12:34 a.m. on February 18, 1979, on the road from Westminster to Gettysburg, Pennsylvania, via Littlestown, Pennsylvania, then known as U. S. Route 140, now Md. 97. Moon was traveling north. His car collided with a southbound vehicle. The driver and passenger in that car were both killed.

Moon was transported via State Police helicopter to the Shock Trauma Unit of University Hospital in Baltimore City. We do not know precisely when he arrived there, but we infer that it was prior to 1:30 a.m. since we note in the hospital record reference to an x-ray examination said to have been made at that hour.

At 2:30 a.m. an osmolality test was administered. At trial, Dr. Yale H. Caplan, Chief Toxicologist of the State Medical

Examiner's office, testified that the value of 347 recorded on that test was "consistent with an alcohol concentration of approximately . . . .15 or .16." He added, "But this is not as definitive a test of alcohol, this is really only an indicator. It's not really a definitive determination of alcohol, but it allows an early assessment of whether alcohol might be involved."

There is in the record an order from Moon's attending physician for a general drug screening test. The prepared form of report for such a test includes alcohol, amphetamines, barbiturates, dilantin, librium, methadone, opium alkaloids, salicylates, and valium, among others, for which tests are to be made. Items added to the form in longhand in this instance include quinine, acetaminophen, and placidyl. The physician's direction and the form of report effectively refute any suggestion that somehow there was a conspiracy between the State Police and University Hospital, another State agency, to obtain the information as to blood alcohol content in circumvention of the statute. The record indicates that the specimen of blood was taken at 2:49 a.m. on February 18. The report shows a blood alcohol content of 0.165%.[1]

The trial judge in his opinion summarized, correctly, certain of the testimony of Dr. Caplan:

In the opinion of Doctor Caplan, a blood alcohol level of .165 represents a significant concentration of alcohol in the blood system. Doctor Caplan

---

1. The agreed statement of facts says, "[A]n analysis of the blood for alcohol content was not performed until February 21, 1979." It is true that the report bears that date. We strongly suspect that the parties have drawn an erroneous inference, the date being when the results of the tests were written up, not when they were performed, just as, for instance, certain x-ray reports show the examination as having been done on February 18 but indicate that the written report was prepared or transcribed on February 27. An obvious purpose for the drug test would be for the attending physician to be certain that anything he prescribed would not run counter to that already in his patient's system, just as some pharmacies monitor prescriptions to be certain that the consumer is not using antagonistic drugs. See Md. Bd. of Pharmacy v. Sav-A-Lot, 270 Md. 103, 109, 311 A.2d 242 (1973). The purpose of the test would not be served were it not available to the physician until three days later.

testified that at a level of .08 all people are affected by alcohol in the system, and as the level rises, as in this case twice the normal level as considered by Doctor Caplan, twice the minimal level, the person so affected tends to have increased self-confidence, decreased concentration, elements of impaired vision, which could possibly lead to double vision; and it causes the individual so affected by the use of alcohol to take a longer period of time to respond to certain situations leading to an increase in reaction time.[2]

The controversy here concerns §§ 10-302 to -309, Courts and Judicial Proceedings Article, which were contained in Code (1957, 1971 Repl. Vol.) Art. 35, § 100 prior to its recodification by Chapter 2 of the Acts of the Special Session of 1973 as a part of the Courts and Judicial Proceedings Article.

Section 10-302 states:

In a prosecution for a violation of a law concerning a person who is driving or attempting to

---

2. The agreed statement of facts says, "Dr. Caplan also stated that he did not agree with the provisions contained in Courts Article § 10-307." In his testimony he indicated that efforts in Maryland to lower the amount of blood alcohol concentration required for prima facie evidence that one was intoxicated had not been successful. He stated that there was more scientific evidence available today than when the standard was originally adopted. His view that the then Maryland standard was too lenient is shared by others. *See, e.g.,* H. Campbell, *Courts and Prosecutors Are the Weak Link in Preventing Drunken Driving,* 46 A.B.A.J. 43, 45 (1960), and R. Forney, Sr., and R. Forney, Jr., *Prosecution of Drivers Impaired by Ethanol or Other Chemicals,* Legal Medicine Annual: 1975; 85, 89-90 (1976). Dr. Campbell was at that time Chairman of the Automotive Safety Subcommittee of the Colorado State Medical Society and Vice-Chairman of the American Medical Association's Committee on Medical Aspects of Automobile Injuries and Deaths. R. Turner, H. Heise, and C. Muehlberger, *Interpretation of Tests for Intoxication,* Chemical Tests for Intoxication Manual, Committee on Medicolegal Problems, American Medical Association 57, 60 (1959), state, "In the countries of Western Europe the limiting values are more stringent. Norway and Sweden have adopted 0.05% as the blood alcohol limit which may not be exceeded by motorists. In Denmark, Germany, and France, the limit is one part per thousand or 0.10%. So the ceiling value of 0.15%, recommended in the Uniform Vehicle Code and adopted into the statutes of 28 of our states, is in keeping with our American tradition of permitting the maximum freedom for the individual which does not interfere materially with public safety."

drive a vehicle in violation of § 21-902 of the Transportation Article, a chemical test of his breath or blood may be administered to the person for the purpose of determining the alcoholic content of his blood.

Code (1977) § 21-902, Transportation Article makes it unlawful for a person to drive or attempt to drive any vehicle while intoxicated; while his driving ability is impaired by the consumption of alcohol; while he is so far under the influence of any drug, any combination of drugs, or any combination of drugs and alcohol that he cannot drive a vehicle safely; and while he is under the influence of any controlled dangerous substance as the term is defined in Code (1957) Art. 27, § 279. With regard to the coverage of § 21-902, Transportation Article see *State v. Loscomb, supra.*

Section 10-303 states that the specimen of breath or blood shall be taken within two hours "after the person accused is apprehended." Qualifications of a person administering a test and of equipment to be used are set forth in § 10-304. A defendant is given the right in § 10-305 to select the type of test to be administered. Provision for admissibility of test results without the presence or testimony of a technician are set forth in § 10-306.

Section 10-307 states:

(a) *In general.* — In a proceeding in which a person is charged with a violation of § 388A of Article 27 or with driving or attempting to drive a vehicle in violation of § 21-902 of the Transportation Article, the amount of alcohol in the person's breath or blood shown in chemical analysis as provided in this subtitle is admissible in evidence and has the effect set forth in subsections (b) through (e) of this section.

(b) *No intoxication presumed.* — If there was in his blood at the time of testing 0.05 percent or less, by weight, of alcohol, as determined by an analysis of his blood or breath, it shall be presumed that the

defendant was not intoxicated and that his driving ability was not impaired by the consumption of alcohol.

(c) *No presumption.* — If there was in his blood at the time of testing more than 0.05 percent, but less than 0.10 percent, by weight, of alcohol, as determined by an analysis of his blood or breath, this fact may not give rise to any presumption that the defendant was or was not intoxicated or that his driving ability was or was not impaired by the consumption of alcohol, but this fact may be considered with other competent evidence in determining the guilt or innocence of the defendant.

(d) *Prima facie evidence of impairment.* — If there was in his blood at the time of testing 0.10 percent, or more, by weight, of alcohol, as determined by an analysis of his blood or breath, it shall be prima facie evidence that the defendant's driving ability was impaired by the consumption of alcohol.

(e) *Prima facie evidence of intoxication.* — If there was in his blood at the time of testing 0.15 percent, or more, by weight, of alcohol, as determined by an analysis of his blood or breath, it shall be prima facie evidence that the defendant was intoxicated.[3]

We have already spelled out the scope of § 21-902 of the Transportation Article. Code (1957, 1976 Repl. Vol., 1978 Cum. Supp.) Art. 27, § 388A pertains to a person "causing the death of another as the result of his negligent driving, operation or control of a motor vehicle while intoxicated," the word "intoxicated" being defined as having "the same meaning as indicated in and is subject to the same presumptions and evidentiary rules of § 10-307 of the Courts Article regarding intoxication under the vehicle laws of this State." It is distinguishable from manslaughter by automobile, Art.

---

3. Chapter 242 of the Acts of 1981 significantly reduced the applicable percentages of this section effective July 1, 1981.

27, § 388, which by its terms requires proof of gross negligence.

Section 10-308 provides that evidence of the chemical analysis does not limit the introduction of other evidence bearing upon whether an accused was intoxicated or whether his driving ability was impaired by the consumption of alcohol. Section 10-309, upon which Moon relies, states:

> (a) *Test not compulsory.* — A person may not be compelled to submit to a chemical analysis provided for in this subtitle. Evidence of chemical analysis is not admissible if obtained contrary to its provisions. No inference or presumption concerning either guilt or innocence arises because of refusal to submit. The fact of refusal to submit is not admissible in evidence at the trial.

> (b) *Consequences of refusal.* — This subsection does not limit the provisions of the vehicle laws regarding the consequences of refusal to submit to a chemical test or tests.

Maryland's statute relative to chemical tests to determine blood alcohol content was proposed by the Legislative Council Committee on the Revision of the Motor Vehicle Laws of the State in 1956.[4] The committee renewed its recommendation in its report to the 1959 session of the General Assembly with an additional proviso that chemical tests could not be given if the suspected person would not agree to it. The General Assembly enacted Chapter 769 of the Acts of 1959 as Code (1957, 1959 Cum. Supp.) Art. 35, § 100. The form in which it was enacted closely followed the 1957 committee recommendation with the addition of the provisions that no person should be compelled to submit to such tests, that no inference or presumption concerning either his guilt or inno-

---

4. It is of interest to note that the chairman of the committee was Edgar P. Silver, now a judge of the Eighth Judicial Circuit, and that committee members included Harry A. Cole, currently a judge of this Court, and George B. Rasin, Jr., now Chief Judge of the Second Judicial Circuit of Maryland.

cence might arise by reason of his refusal to submit to such a test, and that the fact of his refusal to so submit should not be admissible into evidence at his trial. During the statute's trip through the General Assembly, there was added the provision that the specimen of blood, breath or urine must have been taken within two hours after the person being prosecuted was first apprehended by the arresting officer. The statute was applicable to any criminal prosecution for a violation of Code (1957) Art. 66½, § 206 "as amended from time to time," the latter being the then section making it unlawful "for any person who is an habitual user of narcotic drugs or any person who is under the influence of intoxicating liquor or narcotic drugs to drive or attempt to drive any vehicle, streetcar or trackless trolley within this State." Section 100 was also applicable to a prosecution "for a violation of any other law of this State concerning a person who is under the influence of intoxicating liquor driving or attempting to drive any vehicle as specified in such other laws . . . ." That statute provided basically as did the present prior to July 1, 1981, as to the percentages. However, as to breath it required that the amount being measured must be "two thousand cubic centimeters of his breath (true breath or alveolar air having 5½ percentum of carbon dioxide) . . . ." [5] The statute as originally enacted also permitted analysis of urine. Both the requirement of a given amount of air and the provision for urinalysis have been eliminated.

---

5. R. Donigan, *Chemical Tests and the Law* (2d ed. 1966) explains:

> The concentration of alcohol in the exhaled (alveolar) breath coming from deep in the lungs is due to absorption from the blood as it circulates through the capillary vessels which line the air sacs of the lungs. Thus it will be proportional to the alcoholic content of the blood circulating through the lungs. This ratio is about 2,100:1. Thus 2,100 volume units (cubic centimeters or volume ounces) of alveolar breath will contain the same quantity of alcohol as will *one* volume unit of circulating blood. [*Id.* at 13 (emphasis in original).]

To similar effect see R. Burgee, *A Study of Chemical Tests for Alcoholic Intoxication,* 17 Md. L. Rev. 193, 198-99 (1957), and T. Friedemann and K. Dubowski, *Chemical Testing Procedures for the Determination of Ethyl Alcohol,* Chemical Tests for Intoxication Manual, Committee on Medicolegal Problems, American Medical Association 20, 30 (1959). Thus,

Instances of Maryland prosecutions using chemical analysis of blood alcohol content were known before the enactment of Art. 35, § 100 in 1959. *See, e.g., Lilly v. State,* 212 Md. 436, 440, 129 A.2d 839 (1957), where the Court quoted from the testimony on April 16, 1956, of Dr. Henry C. Freimuth, then the Chief State Toxicologist, as to the result of the blood analysis of an individual prosecuted for manslaughter by automobile and "other testimony ... that the intoxication point is 0.15%."

The standards contained in the original Maryland enactment and those which have remained in Maryland up until July 1 of this current year stemmed from the recommendations in 1938 of a joint committee of the National Safety Council and the American Medical Association. H. Campbell, *Courts and Prosecutors Are the Weak 'Link in Preventing Drunken Driving,* 46 A.B.A.J. 43, 44 (1960); R. Donigan, *Chemical Tests and the Law* 23 (2d ed. 1966); and H. Porter, *Value and Purpose of Chemical Tests,* Chemical Tests for Intoxication Manual, Committee on Medicolegal Problems, American Medical Association 2, 3 (1959).[6] Those recommendations found themselves embodied in the Uniform Vehicle Code. Campbell, *op. cit.*

Minor changes were made in the statute. A major change came after the submission of the report in 1968 of the Committee to Study Revision of the Motor Vehicle Laws appointed by the Legislative Council under the chairmanship of Judge S. Ralph Warnken. It recommended an implied consent law "which provides, with many safeguards, for the suspension of driving privileges of a person who refuses to submit to breath or urine tests for blood alcohol content upon arrest for offenses involving the driving of an automobile after consumption of alcohol." *Id.*

the 2,000 cc. of breath originally required in Maryland was close to the equivalent of 1 cc. of blood.

6. It is of interest to note that of the eight physicians who were members of the American Medical Association Committee on Medicolegal Problems, two were from Maryland: Dr. Russell S. Fisher, then and now Chief Medical Examiner of Maryland, and Dr. Manfred S. Guttmacher, then Medical Adviser to the Supreme Bench of Baltimore City.

at v. Immediately thereafter, the statute was revised into basically the present form which closely parallels the Uniform Vehicle Code and Model Traffic Ordinance. It is to be noted, however, that although the wording of the original statute was changed, its basic concepts remained unchanged. The revision of this section was by Chapter 157 of the Acts of 1969. By Chapter 158 the General Assembly adopted a provision which requires each applicant for a motor vehicle license expressly to consent to a determination of the alcoholic content of his blood, breath, or urine.

We note that Moon makes no contentions here on constitutional grounds. Indeed, he could not after the decision of the Supreme Court in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). There an individual charged with driving an automobile while under the influence of intoxicating liquor was arrested at a hospital while receiving treatment for the injuries sustained in an accident. Upon the advice of counsel, he refused to consent to the withdrawal of blood for analysis. Nevertheless, a blood sample was withdrawn by a physician at the direction of a police officer. Justice Brennan said for the Court, "that the privilege [against self-incrimination] protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and ... the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends." *Id.* at 761. The Court also rejected contentions "that the chemical analysis should be excluded from evidence as the product of an unlawful search and seizure in violation of the Fourth and Fourteenth Amendments." *Id.* at 766. It pointed out, "We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* at 770. Accordingly, the Court "conclude[d] that the attempt to secure evidence of blood-alcohol content in th[at] case was an appropriate incident to [Schmerber's] arrest." *Id.* at 771. Justice Brennan said the Court "conclude[d] that the ... record show[ed] no violation of petitioner's right under the Fourth and

Fourteenth Amendments to be free of unreasonable searches and seizures." *Id.* at 772.

Moon has in no way been prejudiced by the fact that the sample here was withdrawn more than two hours after the incident in question. If the statute in question were applicable to the case at bar, his contentions that this delay should bar the evidence would fail for three reasons, anything in *Major v. State,* 31 Md. App. 590, to the contrary notwithstanding. The statute, § 10-303, specifies, "The specimen of breath or blood shall be taken within two hours after the person accused is apprehended." Moon was not arrested at the time. It was some days after the incident in question before charges were preferred. Secondly, an analysis such as was done here reflects the amount of alcohol in the blood at the time it was withdrawn, not at the time of the incident. As time passes the alcohol in the blood disappears as Justice Brennan noted for the Court in *Schmerber.* This process is explained in lay terms in 2 Am. Jur. Proof of Facts, *Blood Tests* (1959):

> Tests show that five minutes after a single glass of beer, alcohol is found in the blood stream which was not there before. It is more than half absorbed within fifteen minutes, eighty per cent or so in one half hour, and all within two hours. Being absorbed it immediately goes into the transportation system of the body, the blood stream, and is carried all over the body and is deposited in the brain, liver, kidneys, and muscles in every part of the body that contains water. Immediately after absorption in the brain, liver, etc., the level of alcohol is about the same as that in the blood at all times. At the conclusion of the absorption process the alcohol is simply distributed throughout the whole body in proportion to the water content. [*Id.* at 587.]

To like effect *see generally* R. Donigan, *Chemical Tests and the Law* 44-46 (2d ed. 1966); R. Forney, Sr., and R. Forney, Jr., *Prosecution of Drivers Impaired by Ethanol or Other Chemicals,* Legal Medicine Annual: 1975, 85, 86-88 (1976);

3 R. Gray, *Attorneys' Textbook of Medicine* ¶ 59A.31-.32 (3d ed. 1981); 4 R. Gray, *op. cit.,* ¶ 133.23-.24; and address of Lewis P. Gundry, M.D., as set forth in *The Compulsory Use of Chemical Tests for Alcoholic Intoxication-A Symposium,* 14 Md. L. Rev. 111, 115 (1954). Thus, a report as to the alcohol content of Moon's blood at a time more than two hours after the incident would not be less favorable to Moon than a report as to the alcohol content at a time within the two hour period. The third reason, as explained by the Ohio court in a similar case, *Barber v. Curry,* 40 Ohio App. 2d 346, 349-51, 319 N.E.2d 367 (1974), is the time lag would relate not to admissibility of evidence but as to the presumptions arising from the evidence.

Courts in other states have approached problems similar to that before the Court in various ways, often depending upon the statute of the individual state. For instance, in *State v. Robarge,* 35 Conn. Supp. 511, 391 A.2d 184 (1977), the defendant was convicted of negligent homicide with a motor vehicle. The blood sample in question was taken in the hospital emergency room in the presence of two police officers after the accused was under arrest, but without her consent. Her claim that this violated the Connecticut statute similar to the Maryland statute was said by the Court to be "wholly unsound" since its provisions "pertain[ed] only to prosecutions for the operation of a motor vehicle while under the influence of intoxicating liquor or drugs . . . ." 391 A.2d at 185. A short time later the Connecticut Supreme Court in *State v. Singleton,* 174 Conn. 112, 384 A.2d 334 (1977), had before it a case where the defendant was found guilty of misconduct with a motor vehicle "in that he 'with criminal negligence in the operation of a motor vehicle or in consequence of his intoxication while operating a motor vehicle, . . . cause[d] the death of another person.' " The blood sample in that instance was taken with his consent. To his contention, however, that the evidence should be suppressed because there had not been compliance with all of the procedural requirements of the section relative to blood samples, the court said that the statute by its express terms applied to a criminal prosecution for the offense of operating a motor

vehicle while under the influence of intoxicating liquor or drugs or both and that the Legislature had not made it applicable to the offense with which the defendant was charged. 384 A.2d at 336. Its position was in contrast with that of the court in *People v. Keen,* 396 Mich. 573, 242 N.W.2d 405 (1976). There the court held that the result of a blood alcohol test was not admissible in evidence in a prosecution for manslaughter. Consent to the test had been duly given. The statute was similar to that of Maryland. The court said, "It would exceed the scope of the consent given to allow test results obtained on the representation that they will be used in prosecutions where the maximum penalty for a first offender is 90 days imprisonment to be used in prosecutions for a felony with a maximum penalty of 15 years." 242 N.W.2d at 411-12.

By dicta or by way of express holding, courts in Colorado, Georgia, Idaho, Minnesota, Montana, Nebraska, New York, Pennsylvania, South Dakota, and Wyoming have held statutes similar to that in Maryland do not bar admission of evidence of blood alcohol content in prosecutions for an offense such as our manslaughter by automobile. *See, e.g., People v. Duemig,* 620 P.2d 240, 244 (Colo. 1980), *cert. denied,* 101 S.Ct. 2048 (1981); *Strong v. State,* 231 Ga. 514, 516, 202 S.E.2d 428 (1973), *cert. denied,* 416 U.S. 994 (1974); *State v. Fisk,* 92 Idaho 675, 680, 448 P.2d 768 (1968); *State v. Capelle,* 285 Minn. 205, 172 N.W.2d 556, 559 (1969); *State v. Campbell,* 615 P.2d 190 (Mont. 1980); *Hoffman v. State,* 160 Neb. 375, 384, 70 N.W.2d 314 (1955); *People v. Leis,* 13 A.D.2d 22, 24, 213 N.Y.S.2d 138 (1961); *Commonwealth v. Trefry,* 249 Pa. Super. Ct. 117, 375 A.2d 786, 792-93 (1977); *State v. Aarhus,* 80 S.D. 569, 572, 128 N.W.2d 881 (1964); *Van Order v. State,* 600 P.2d 1056, 1058 (Wyo. 1979); and *State v. Chastain,* 594 P.2d 458, 461 n.4 (Wyo. 1979).

Other cases, usually under the peculiar wording of the statutes involved, have rejected admission of evidence in circumstances similar to the case at bar. *See, e.g., People v. Todd,* 59 Ill. 2d 534, 544, 322 N.E.2d 447 (1975); *State v.*

*Hitchens,* 294 N.W.2d 686, 689 (Iowa 1980); and *State v. Bellino,* 390 A.2d 1014, 1023 (Me. 1978).

A little bit different situation was before the courts in *Morrow v. State,* 303 A.2d 633 (Del. 1973), and *Murray v. United States,* 358 A.2d 314 (D.C. 1976). Morrow was convicted of operating a motor vehicle while under the influence of intoxicating liquor. A blood sample was taken from him while he was admittedly incapable of refusing to submit to it. The Delaware statute is to the effect that any person who is unconscious or otherwise in a condition rendering him incapable of refusal to consent shall not be deemed to have withdrawn that consent. Morrow contended that upon regaining the full exercise of his faculties he should be allowed to withdraw his implied consent, notwithstanding the statutory provision. In rejecting Morrow's contention, Vice Chancellor Marvel said for the Delaware Supreme Court that to grant such a privilege "would give to the severely intoxicated ... an advantage over the less inebriated, the latter being required, when capable of making a choice, to decide whether or not to refuse to take the test . . . ." *Id.* at 635. A virtually identical contention was made in *Murray.* He had been convicted by a jury of two counts of negligent homicide and driving under the influence of intoxicating liquor. The court there said, "To interpret the Act to provide that unconscious motorists involved in serious accidents later could object successfully to the introduction of scientific evidence against them, while conscious motorists would be denied that right in similar circumstances, would lead to an absurd result." *Id.* at 319.

Moon sees the sections here before the Court as having been enacted for the protection of an accused. We see them as concerned with the protection of the public. We read the several sections together, they having been originally enacted as one section. The blood sample here simply was not taken for the purpose of prosecution. The provisions of §§ 10-302 to -309 are applicable to testing done for a prosecution. They are an authorization for evidence so withdrawn to be received as prima facie evidence. As we have

previously indicated, *before* the passage of the predecessor to §§ 10-302 to -309, evidence of blood alcohol content had been received in Maryland. The statute in no way provides that in no other circumstance shall evidence of blood alcohol content be received. The blood here not having been withdrawn under the provisions of that statute, its requirements as to consent simply are not applicable. Moon was not under arrest nor had he been charged. The record indicates that the blood was withdrawn as a part of routine hospital procedures. There are understandable reasons in connection with the treatment of Moon for the various tests that were made, tests that were by no means confined to alcohol but covered a broad spectrum of drugs. The evidence here is in no different position from that of any other evidence which the State might subpoena as, for instance, documentary evidence to prove that an individual had submitted a forged birth certificate to make the proof of age required by § 16-106 (d), Transportation Article, in connection with an original driver's license application, or that which would establish that a person had altered the odometer of a motor vehicle in violation of § 22-415.

Moon would have us hold that the conviction is void because the trial judge referred in his decision to the presumptions contained in § 10-307. If this reference was in error, then it was harmless beyond a reasonable doubt since in the very next paragraph he referred to the testimony of Dr. Caplan which clearly spelled out the effects of a blood alcohol concentration such as Moon had.

Because of the theory upon which the Court of Special Appeals determined Moon's appeal, it was not obliged to address certain of his contentions. Therefore, those questions must be considered on the remand.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court for consideration of undecided issues; appellee to pay the costs.*

*Davidson, J., dissenting:*

The first question this case presents is whether the exclusionary rule contained in Md. Code (1974, 1980 Repl. Vol.) § 10-309 of the Courts and Judicial Proceedings Article, which, under certain circumstances, renders the results of chemical tests for alcohol inadmissible in evidence, is applicable to chemical test results administered initially for the purpose of medical treatment of the accused. The majority concludes that the exclusionary rule applies to the results of chemical tests administered by, or at the direction of, a police officer initially for the purpose of prosecution but is inapplicable to tests administered by, or at the direction of, a physician for the initial purpose of medical treatment. In my view, the plain meaning of the statute and its legislative history support the conclusion that the exclusionary rule contained in § 10-309 is applicable to evidence of chemical test results, regardless of the purpose for which they were initially administered.

The legislative history of Md. Code (1974, 1980 Repl. Vol. & 1980 Supp.) § 10-302 through § 10-309 of the Courts and Judicial Proceedings Article, effective 1 January 1974, shows that these sections were preceded by Md. Code (1957, 1959 Repl. Vol.), Art. 35, § 100 of the Evidence Title, effective 1 June 1959. An examination of the legislative history of Art. 35, § 100 shows that as long ago as 1954, the Maryland Legislature was concerned with the problem of promoting safety on the highways through the successful prosecution of drunk drivers. One means considered was to make the results of chemical tests for alcohol admissible in evidence. For several years, the Legislature debated whether such tests for alcohol were sufficiently reliable to be admissible. *See* Burgee, *A Study of Chemical Tests for Alcoholic Intoxication,* 17 Md.L.Rev. 193 (1957); *The Compulsory Use of Chemical Tests for Alcoholic Intoxication — A Symposium,* 14 Md. L.Rev. 111 (1954). Ultimately, it decided that such tests could be admitted under certain limited conditions designed to protect the accused, the primary one being that the accused affirmatively consent to the adminis-

tration of the test. By creating statutory protections for the individual, the Legislature established that while its purpose was to protect the societal interest in successful prosecution of drunk drivers, that purpose was not to be accomplished at the expense of individual rights which the Legislature deemed to be essential.

In 1954, in the House of Delegates (House), House Bill (HB) No. 94 was introduced as an amendment to the Motor Vehicles Title.[1] House Bill No. 94 authorized the admission of chemical test results in evidence in prosecutions for a violation of a specified section of the Motor Vehicles Title[2] that made it unlawful for anyone under the influence of intoxicating liquor to drive or attempt to drive any vehicle. It also established certain presumptions to be applied in determining whether an accused was under the influence of intoxicating liquor. House Bill No. 94 contained no protections for the accused in the form of conditions relating to the circumstances under which chemical tests must be administered. In the absence of any prescribed conditions, there was no basis for an exclusionary rule and none was provided. This Bill was not enacted.

In 1955, HB No. 41 was introduced, not as an amendment to the Motor Vehicles Title, but rather as an amendment to the Evidence Title, adding § 100 to Art. 35 of the Annotated

---

1. HB No. 94, introduced 12 February 1954, 1st reading, Committee on Judiciary, 1954 *House Journal of Proceedings,* pp. 198, 223, proposed an amendment to

"... Section 171 of Article 66 ½ of the Annotated Code of Maryland (1951 Edition), title 'Motor Vehicles,' sub-title 'Persons Under the Influence of Intoxicating Liquor or Narcotic Drugs,' authorizing the admission into evidence of the findings of chemical tests for intoxieation, and relating generally to the provisions applying to such tests."

2. Md. Code (1951), Art. 66 ½, § 171 provided in pertinent part:

"(Persons Under the Influence of Intoxicating Liquor or Narcotic Drugs.) It shall be unlawful for any person who is an habitual user of narcotic drugs or any person who is under the influence of intoxicating liquor or narcotic drugs to drive or attempt to drive any vehicle, street car or trackless trolley within this State."

Code of Maryland.[3] House Bill No. 41 broadened the scope of its 1954 predecessor, HB No. 94, by authorizing the admission of chemical test results in evidence in any criminal prosecution for a violation of any law concerning a person driving or attempting to drive while under the influence of intoxicating liquor. Like HB No. 94, it also established certain presumptions; it contained no express protections for the accused in the form of conditions governing the administration of the tests; and it contained no exclusionary rule. House Bill No. 41 was, however, amended to provide that

> "no person shall be compelled to submit . . . to the chemical analysis provided for in this section; and no inference or presumption concerning either his guilt or innocence shall be made by reason of his refusal to so submit to such chemical analysis."
> *House Journal of Proceedings,* at 246 (1955).

This amendment was the initial indication of a legislative intent to create statutory protections deemed to be essential for an accused. It was also the initial indication of a legislative intent that test results be admissible only upon the condition that the accused not be compelled to submit to the test. Because the first condition created to protect an accused was that an accused not be compelled to submit to a chemical test, it is apparent that the protection of that right was deemed by the House to be essential and of paramount importance. House Bill No. 41, as amended, was passed by the House but not the Senate.

---

3. HB No. 41, introduced 12 January 1955, passed in House, 1955 *House Journal of Proceedings,* pp. 58, 246, 259, 1st reading in Senate, Committee on Judicial Proceedings, 1955 *Senate Journal of Proceedings,* p. 240-41, proposed an amendment

> "to add Section 100 to Article 35 of the Annotated Code of Maryland (1951 Edition and 1954 Supplement), title 'Evidence', . . . to be under the new sub-title 'Chemical Tests for Intoxication', establishing certain tests for the amount of alcohol in the defendant's blood *in any criminal prosecution for a violation of the laws concerning driving or attempting to drive certain vehicles while under the influence of intoxicating liquor* and establishing the evidential effect of such tests." (Emphasis added.)

In 1956, the Legislative Council Committee on the Revision of the Motor Vehicle Laws of the State of Maryland drafted HB No. 13, introduced in 1957 as an amendment to Art. 35, the Evidence Title.[4] House Bill No. 13 as originally introduced, like its 1955 predecessor, HB No. 41 as originally introduced, authorized the admission of chemical test results in evidence in any criminal prosecution for violation of any law concerning driving or attempting to drive while under the influence of intoxicating liquor. Like its 1955 predecessor, HB No. 41, it established certain presumptions; it contained no express protections for the accused in the form of conditions governing the administration of tests; and it contained no exclusionary rule. More specifically, it did not contain a provision expressly stating that no person be compelled to submit to a chemical test. Notwithstanding the absence of such an express provision, the Committee, in its Report to the General Assembly of 1957, stated at 382:

> "... The proposed legislation does not require any involuntary taking of a person's blood to determine the percentage of alcohol therein. It merely establishes the evidential effect of such tests based on the percentage of alcohol found in the blood." (Emphasis added.)

House Bill No. 13, like its 1955 predecessor HB No. 41, was amended to provide expressly for certain protections for the accused. It expressly stated that no person shall be compelled to submit to a chemical test and that inference of guilt or innocence should not arise because he refused to submit

---

4. HB No. 13, introduced 2 January 1957, passed in House, 1957 *House Journal of Proceedings,* pp. 298-99, 1st reading in Senate, Committee on Judicial Proceedings, 1957 *Senate Journal of Proceedings,* p. 241, proposed

> "to add Section 108 to Article 35 of the Annotated Code of Maryland (1951 Edition and 1956 Supplement), title 'Evidence' . . . to be under the new sub-title 'Chemical Tests for Intoxication', establishing certain tests for the amount of alcohol in the defendant's blood in any criminal prosecution for a violation of the laws concerning driving or attempting to drive certain vehicles while under the influence of intoxicating liquor, and establishing the evidential effect of such tests."

to the test. More significantly, HB No. 13 was further amended to provide that

> "evidence of the said chemical analysis shall not be deemed admissible if obtained contrary to the provisions of this sub-section. . . ." *House Journal of Proceedings,* at 272 (1957).

This amendment established for the first time an exclusionary rule that prohibited the admission of chemical test results in evidence unless certain conditions designed to protect the accused were satisfied. It indicated an intensification of a legislative intent to protect the accused by providing a method of enforcement for the statutory rights the amendment created. House Bill No. 13, as amended, was passed by the House but not by the Senate.

In 1958, Senate Bill (SB) No. 38 authorized the admission of chemical test results in evidence in any criminal prosecution for a violation of any law concerning driving or attempting to drive while under the influence of intoxicating liquor.[5] It also established certain presumptions, and it expressly protected the accused from being compelled to submit to such tests by making inadmissible evidence which violated that statutorily created right. The Legislative Council Committee on the Revision of the Motor Vehicle Laws, in its Report to the General Assembly of 1959, stated at 208:

> "It is recognized by the Committee that *indiscriminate use of chemical tests may abridge the rights of innocent persons.* To mitigate this fear the Committee views favorably the provision of Senate Bill No. 38 of the 1958 regular session *which stipulated that the chemical tests could not be given if the suspected person would not agree to it.* With this qualifying proviso, the Committee would view favorably legislation introduced to provide chemical tests." (Emphasis added.)

---

5. SB No. 38, introduced 6 February 1958, 2nd reading, Judicial Proceedings Committee, 1958 *Senate Journal of Proceedings,* pp. 64, 70.

Thus, the Committee expressed the view that the provision that no person shall be compelled to submit to a test meant that the test could not be administered unless the accused affirmatively consented.

Although SB No. 38 was not enacted, in 1959, HB No. 132 was introduced to amend the Evidence Title adding "Section 100 to Article 35 of the Annotated Code of Maryland (1957 Edition) . . . ." House Bill No. 132, as originally introduced, was similar to its 1958 predecessor, SB No. 38, in that it authorized the admission of the results of chemical tests in evidence in any criminal prosecution for a violation of any law concerning driving or attempting to drive while under the influence of intoxicating liquor. It established certain presumptions, and it expressly protected the accused from being compelled to submit to the test by making inadmissible evidence which violated that statutory right. In addition, HB No. 132 as originally proposed, added three additional protections for the accused by imposing three additional conditions governing the administration of the tests. Only certain qualified medical personnel were authorized to perform the test.[6] The accused was permitted to have a physician of his own choosing perform an additional test.[7] The accused was entitled to the results of the test before trial.[8] Moreover, two amendments providing additional protections for an accused were passed. The first amendment

---

6. Art. 35, § 100 (d) provided:

"Only a physician, or qualified medical personnel, acting at the request of a police officer, or a person acting at the request of a physician, can withdraw blood for the purpose of determining the alcoholic content therein. This limitation does not apply to the taking of a breath test or a urine specimen."

7. Art. 35, § 100 (e) provided:

"The person tested shall be permitted to have a physician of his own choosing administer a chemical test in addition to the one administered at the direction of the police officer."

8. Art. 35, § 100 (f), as amended, provided:

"Upon the request of the person who was tested, the results of the test will be made available to him before trial by an official certificate which shall be admissible in evidence."

provided that a specimen of blood must be taken within two hours after the accused was apprehended by an arresting officer.[9] The second amendment reinforced the exclusionary rule by making the fact that an accused refused to submit to a blood test inadmissible in evidence.[10] House Bill No. 132 was enacted and became Art. 35, § 100 of the Evidence Title, effective 1 June 1959.

The legislative history of Art. 35, § 100, the predecessor of § 10-302 through § 10-309 of the Courts and Judicial Proceedings Article, embodied the Legislature's initial determination that certain chemical test results for alcohol were sufficiently reliable to permit their admission in evidence under certain limited conditions. Those conditions embodied statutorily created rights, deemed to be essential for the protection of the accused, and were made enforceable by an exclusionary rule, rendering chemical test results inadmissible if obtained in violation of those express conditions. Of primary importance in the established statutory scheme was the express right of the accused not to be compelled to submit to a test and, as interpreted by the Legislative Council Committee, the right to have the chemical test results excluded unless the accused had affirmatively consented.

Thus, the legislative history of Art. 35, § 100 establishes that while the Legislature's purpose was to protect the societal interest in successful prosecution of drunk drivers,

---

**9.** Art. 35, § 100 (a), as amended, provided in pertinent part:

"In any criminal prosecution for a violation of Section 206 of Article 66 ½ of this Code (1957 Edition, as amended from time to time) or for a violation of any other law of this State concerning a person who is under the influence of intoxicating liquor driving or attempting to drive any vehicle as specified in other laws, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath or other bodily substance, shall be admitted as evidence, *provided, however, that the specimen of blood, breath, or urine must have been taken within two hours after the person being prosecuted was first apprehended by the arresting officer. . . .*" (Emphasis added.)

**10.** Art. 35, § 100 (c), as amended, provided in pertinent part:

". . . nor shall the fact of his refusal to so submit be admissible into evidence at his trial."

that purpose was not to be accomplished at the expense of rights of an accused deemed to be essential. There is nothing to indicate that the applicability of the exclusionary rule depended upon whether chemical test results used in a prosecution were administered initially for the purpose of prosecution or initially for the purpose of medical treatment. The conclusion that whenever chemical test results are used for the purpose of criminal prosecution, the exclusionary rule applies regardless of the initial purpose for which the test was administered, is further supported by an examination of the subsequent development of the statutory scheme.

In 1968, after four years of intensive study and consideration, the Committee to Study the Revision of the Motor Vehicle Laws, under the chairmanship of Hon. S. Ralph Warnken, submitted a "Proposed Revision of the Motor Vehicle Laws of the State of Maryland" to the Legislative Council of Maryland. The Committee's proposals were based upon the Uniform Vehicle Code, adopted in whole or in part by many other states. The proposed draft followed "very closely the organization of the parallel provisions of the Uniform Vehicle Code." [11] Included among the proposed improvements was a recommendation for the adoption of an implied consent law, which would have provided, "with many safeguards," for the suspension of driving privileges of a person who refused to submit to chemical tests for alcohol.[12]

Unlike many other states, the Maryland Legislature rejected the proposed implied consent law. Instead, on 23 April 1969, it enacted Chapter 158, Art. 66 ½, § 92A, effective 1 July 1969, which required Maryland residents to consent expressly to the administration of a chemical test as

---

11. *See* Warnken Committee to Study the Revision of the Motor Vehicle Laws, "Proposed Revision of the Motor Vehicle Laws" (1968), p. iii.

12. *See* Warnken Committee Report at p. v. The proposed text of the implied consent provision provided at p. 82:

"Any person who operates or attempts to operate a motor vehicle upon the public highways of this State *shall be deemed to have given consent* ... to a chemical test or tests of his breath or urine, for the purpose of determining the alcoholic content of his blood. ..." (Emphasis added.)

a condition to obtaining a driver's license.[13] By requiring the express consent of an accused before administering a chemical test, the Maryland Legislature reiterated its intent and purpose to protect rights of an accused deemed to be essential.[14]

On the same day the Legislature enacted Art. 66 ½, § 92A, it also repealed and reenacted Art. 35, § 100. Subsec-

---

**13.** The preamble to Art. 66½, § 92A states that the purpose of the Act is

"to provide as a condition to obtaining or renewing a motor vehicle driver's license, the applicant *shall expressly* consent to the taking of a chemical test...." (Emphasis added.)

Art. 66½, § 92A (a) and (b) provided in pertinent part:

"(a) Prior to the issuance of any license or renewal thereof to exercise the privilege of operating a motor vehicle upon the highways of this State, the applicant, as a condition precedent to the issuance or renewal of said license, shall be required by the Department *to sign a statement,* under oath or affirmation, containing the following language:

'*I hereby consent to take a chemical test* to determine the alcoholic content of my blood, breath, or urine....'"

"(b) In return for the privilege of operating a motor vehicle on the highways of this State given to a nonresident under this Article, any nonresident who operates or attempts to operate a motor vehicle upon the highways of this State, *shall be deemed to have given consent to take a chemical test for alcohol."* (Emphasis added.)

The successor to Art. 66½, § 92A, Md. Code (1977, 1980 Cum. Supp.) § 16-205.1 of the Transportation Article, effective 1 July 1977, was amended, by Chapter 244 of the 1981 Laws of Maryland, effective 1 July 1981, and therefore, not applicable here, to provide an implied consent provision applicable to Maryland residents. That Chapter states in pertinent part:

"(a) Any person who drives or attempts to drive a motor vehicle on a highway or on any private property that is used by the public in general in this State is deemed to have consented, subject to the provisions of §§ 10-302 through 10-309, inclusive, of the Courts and Judicial Proceedings Article, to take a chemical test to determine the alcohol content of his blood if he should be detained on suspicion of driving or attempting to drive while intoxicated or while under the influence of alcohol."

"(b) A person may not be compelled to take a chemical test for alcohol...."

**14.** In light of the Maryland Legislature's rejection of the implied consent provisions contained in the Uniform Motor Vehicle Code, cases from jurisdictions other than Maryland, relied upon by the majority, are not persuasive.

tion (c) was amended to provide an additional protection to an accused by establishing the right to select the type of test to be administered.[15] More important, Art. 35, § 100(g), which then provided that an officer advise an accused that he "may, but need not" submit to a chemical test, and had been interpreted by this Court in dicta in *Mauldin v. State,* 239 Md. 592, 595, 212 A.2d 502, 504 (1965), as not requiring that an accused affirmatively consent to a test, was deleted from the Evidence Title. A requirement that an officer request that the person take a chemical test and file a report if that person refused, was enacted in Art. 66½, § 92A of the Motor Vehicles Title.[16] By creating an additional statutory right and by explicitly providing that affirmative consent of the accused be obtained, the Legislature once again

---

**15.** Art. 35, § 100 (c), as amended, provided in pertinent part:

"In any event, the defendant shall have the right to select the type of test administered, and if facilities or equipment are not available for such test then none shall be given, and this fact shall not create any inference or presumption concerning either his guilt or innocence by reason of his inability to take a test, nor shall the fact of his inability to take such a test be admissible in evidence at his trial, nor shall this fact be considered a refusal to take a test under Section 92A of this Article."

Chapter 240 of the 1981 Laws of Maryland, effective 1 July 1981, not here applicable, amended § 10-305 of the Courts and Judicial Proceedings Article, the successor to Art. 35, § 100(c), to provide that under certain circumstances a police officer, rather than an accused, may select the type of test to be administered and that persons incapable of refusing to take a test shall be deemed not to have withdrawn consent. More specifically, § 10-305 (c) provides:

"Any person who is dead, unconscious, or otherwise in a condition rendering him incapable of test refusal shall be deemed *not* to have withdrawn consent."

**16.** Art. 66½, § 92A (c) provided in pertinent part:

"(c) It shall be the duty of any police officer who stops or detains any person who he has reasonable grounds to believe is or has been operating or attempting to operate a motor vehicle under the influence of alcohol, or who is or has been operating or attempting to operate a motor vehicle while his ability was impaired by the consumption of alcohol to do all the following things:

. . .

"2. *Request that he take a chemical test* or tests of his blood. . . .

. . .

"4. File with the Department of Motor Vehicles . . . a sworn

reiterated its determination to protect the rights of the accused.

In 1973, Art. 35, § 100 was revised and reenacted as § 10-302 through § 10-309 of the Courts and Judicial Proceedings Article. The Revisor's Notes accompanying § 10-302 through § 10-309 indicate that those sections contained new language derived from Art. 35, § 100 and that the changes made were changes in style and language. While the Revisor's Notes are not law and may not be considered to have been enacted as part of the Act, ch. 2, § 19, 1973 Laws of Md. Spec. Sess., they are entitled to weight. *See Rentals Unlimited, Inc. v. Administrator, Motor Vehicle Admin.,* 286 Md. 104, 109, 405 A.2d 744, 748 (1979). These Notes establish that the language revisions in § 10-302 through § 10-309 were not intended to produce substantive changes in the law or its purpose.

Only one other relevant change occurred when, in 1977, Art. 66½, § 6-205.1, the successor to Art. 66½, § 92A, was revised and reenacted as § 16-205.1 of the Transportation Article. While Art. 66½, § 6-205.1 (c) (2) required that officers request persons to submit to chemical tests, § 16-205.1 (c) (2) requires that officers request such persons to *permit* chemical tests to be administered. The Revisor's Note accompanying § 16-205.1 establishes that this language change is one of style, thus clarifying the previous language and establishing that the affirmative consent of an accused is required before a chemical test is administered by or at the direction of a police officer.

The Legislature's initial determination to protect the rights of an accused by requiring that an accused not be compelled to submit to a chemical test, its adoption of an exclusionary rule to enforce that right, its subsequent repeated determinations to provide additional protections for an accused, its rejection of an implied consent statute and its adoption of an express consent statute, its requirement

---

report ... that said person *refused to take the chemical test* for alcohol. ..." (Emphasis added.)

that an accused affirmatively consent to a test administered by or at the direction of a police officer, and the Legislative Council Committee's repeated statements that there be no "involuntary taking of a person's blood" and that chemical tests could not be administered if an accused "would not agree to it," all lead to a single conclusion. In my view, this history establishes a legislative purpose to protect the rights of an accused, particularly the right not to be compelled to submit to a test, whenever chemical test results are ultimately used for the purpose of criminal prosecution.

Sections 10-302 through 10-309 expressly state that chemical test results are admissible in evidence under certain limited conditions in any criminal prosecution for a violation of any state law concerning a person accused of driving while intoxicated. More specifically, the exclusionary rule contained in § 10-309 expressly states that such test results are inadmissible in such prosecutions if obtained contrary to the requirements set forth in the subtitle. In my view, the plain and unambiguous language of the statute establishes that the exclusionary rule applies whenever test results are ultimately used for the purpose of criminal prosecution. Such an interpretation is manifestly consonant with the Legislature's broad purpose.

Moreover, there is no express language in § 10-302 through § 10-309 that states that the exclusionary rule does not apply when results of a chemical test, administered by or at the direction of a physician initially for the purpose of medical treatment are subsequently used for the purpose of prosecution. In addition, there is nothing in the legislative history to indicate a legislative intent to make the applicability of the exclusionary rule dependent upon whether chemical test results used in a prosecution were administered initially for the purpose of prosecution or initially for the purpose of medical treatment. I cannot, as does the majority, insert words creating an exception to the applicability of the exclusionary rule that makes the statute express an intention different from its clear meaning. *See Holy Cross Hosp. of Silver Spring, Inc. v. Maryland Employ-*

*ment Sec. Admin.,* 288 Md. 685, 698, 421 A.2d 944, 950 (1980); *In re: James S.,* 286 Md. 702, 705, 410 A.2d 586, 591 (1980).

The majority's reliance on the case of *Lilly v. State,* 212 Md. 436, 129 A.2d 839 (1956), to support its conclusion that chemical test results administered for the purpose of medical treatment are admissible in evidence, is misplaced. In *Lilly,* a case involving a prosecution for a violation of the predecessor to Md. Code (1957, 1976 Repl. Vol.), Art. 27, § 388, the State was not contending that the accused was operating a motor vehicle under the influence of liquor. Nevertheless, the results of a chemical test were admitted in evidence. The facts show, however, that the chemical test was administered at the direction of a police officer after he had obtained the affirmative consent of the accused. Under these circumstances, *Lilly* can lend no support to the majority's conclusion that the results of chemical tests administered at the direction of a physician for the purpose of medical treatment are admissible in evidence. Rather, in my view, the plain language of the statute, the Legislature's broad purpose, and its insistence on protecting the rights of an accused lead to the conclusion that whenever chemical test results are used for the purpose of criminal prosecution, the exclusionary rule applies regardless of the initial purpose for which the test was administered.

The remaining question this case presents is whether § 10-309 is violated when an accused does not affirmatively consent to a chemical test, administered by or at the direction of a physician, initially for the purpose of medical treatment.

Section 10-309 of the Courts and Judicial Proceedings Article provides in pertinent part:

> "A person may not be compelled to submit to a chemical analysis provided for in this subtitle. Evidence of chemical analysis is not admissible if obtained contrary to its provisions."

The plain language of this section establishes that chemical

test results are inadmissible in a prosecution if the accused is compelled to submit to the test.

In *State v. Loscomb,* 291 Md. 424, 435, 435 A.2d 764, 770 (1981), this Court unanimously agreed[17] that § 16-205.1 of the Transportation Article and § 10-302 through § 10-309 of the Courts and Judicial Proceedings Article are in *pari materia* and must be construed harmoniously. Therefore, § 16-205.1 is significant in determining the meaning of the word "compelled." Section 16-205.1 provides in pertinent part:

> "(c) ... If a police officer stops or detains any individual who the police officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while intoxicated or while his driving ability is impaired by the consumption of alcohol, the police officer shall:
>
> . . .
>
> "(2) Request that the individual *permit* a chemical test to be taken of his blood...." (Emphasis added.)

In *Loscomb,* we determined that when a chemical test is administered by or at the direction of a police officer initially for the purpose of prosecution, the affirmative consent of an accused must be obtained and that the exclusionary rule of § 10-309 applies when there has been a failure to obtain such affirmative consent. This conclusion was based upon the rationale that under such circumstances the accused was compelled to submit to the test.

I recognize that there is no express statutory provision requiring affirmative consent when a chemical test is administered by or at the direction of a physician for the initial purpose of medical treatment. However, the Legislature's initial determination to protect the rights of an accused by requiring that an accused not be compelled to

---

17. Eldridge, J., did not participate.

submit to a chemical test, its adoption of an exclusionary rule to enforce that right, its rejection of an implied consent statute and its adoption of an express consent statute, its requirement that an accused affirmatively consent to a test administered by or at the direction of a police officer, and the Legislative Council Committee's repeated statements that there be no "involuntary taking of a person's blood," and that chemical tests could not be administered if an accused "would not agree to it," all lead to a single conclusion. In my view, this history establishes a legislative purpose to protect the rights of an accused by requiring affirmative consent to a chemical test whenever chemical test results are ulitmately used for the purpose of criminal prosecution. I cannot conclude, as does the majority, that the Legislature intended the definition of the word "compelled" to include a person who has not given affirmative consent to a chemical test administered by or at the direction of a police officer initially for the purpose of prosecution, but not to include a person who has not given affirmative consent to such a test administered by or at the direction of a physician initially for the purpose of medical treatment. In the final analysis, a person who has not affirmatively consented to the administration of a chemical test is equally compelled to submit to that test whether administered by a physician for the initial purpose of medical treatment or administered by a police officer for the initial purpose of prosecution. In addition, such a person is equally prejudiced when such chemical test results are admitted in evidence, whether the test was administered for the initial purpose of medical treatment or for the initial purpose of prosecution.

In view of the plain language of the statute, the Legislature's broad purpose and its insistence on protecting the rights of an accused, I would hold that the exclusionary rule applies to and prohibits the admission in evidence of chemical test results administered by a physician initially for the purpose of medical treatment without the affirmative consent of the accused.

Here the record shows that the chemical test results admitted in evidence were administered at the direction of a physician for the purpose of medical treatment without obtaining the affirmative consent of the accused. Under these circumstances, the accused was compelled to submit to the chemical test in violation of § 10-309. Moreover, the record shows that the accused did not have the right to select the type of test administered as required by § 10-305. In my view, the exclusionary rule contained in § 10-309 prohibited the admission of such evidence. The trial court committed prejudicial error when it admitted the chemical test results. Given the majority's view expressed in *Loscomb,* that the exclusionary rule contained in § 10-309 is applicable in prosecutions for violations of Art. 27, § 388 as well as in prosecutions for violations of Md. Code (1977) § 21-902 of the Transportation Article, effective 1 July 1977, I would affirm the judgment of the Court of Special Appeals, reversing the trial court's judgment.

Judge Eldridge authorizes me to say that he concurs in the views herein expressed.